*Orig*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6079–Civ–Dimitrouleas/Johnson

| | |
|---|---|
| BLANCHE BENFORD, | ) |
| CLAVEDIA BROS, and | ) |
| MADIE MOORE | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| NORTHWEST AIRLINES, INC., | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS OF MADIE MOORE

1.    Plaintiff Madie Moore ("Moore") is an African-American female. (Deposition of Madie Moore ("Moore Dep.")[1] at 23).

2.    Moore is currently employed by Northwest in Atlanta, Georgia as a stock clerk. (Moore Dep. at 31, 109).

3.    Moore worked as a reservation sales agent in Tampa, Florida ("Tampa reservations") from March 1987 through April 1999. (Moore Dep. at 31).

---

[1]Cited excerpts and exhibits from the deposition of Madie Moore are attached hereto collectively at Tab 1.

4.    Moore successfully bid on a cruise desk position and began training for the cruise desk in October 1994. (Moore Dep. at 192; Declaration of Timothy J. Bechtold ("Bechtold Decl.")[2] at ¶ 3).

5.    Moore was required to undergo a probationary training period prior to being awarded a permanent position on the cruise desk. (Moore Dep. at 182; Bechtold Decl. at ¶ 6).

6.    The cruise desk was a position within Tampa reservations where reservation sales agents coordinated with cruise lines to provide flights to and from cruise ship ports. (Bechtold Decl. at ¶ 5).

7.    The cruise desk was staffed by reservation sales agents who received the same compensation and benefits as other reservation sales agents working other Tampa reservation positions. (Moore Dep. at 131; Bechtold Decl. at ¶ 4).

8.    Moore claims she was to be trained by Shawna Horvath[3], a Tampa reservation sales agent, who also worked the cruise desk. Horvath's training of Moore included the introduction of material and skills necessary for Moore to successfully complete the probationary period on the cruise desk. While Horvath was to provide training to Moore, Horvath was also to continue her responsibilities as a reservation sales agent on the cruise desk. (Moore Dep. at 194; Bechtold Decl. at ¶ 7).

9.    Moore received three training reviews during her probationary period on the cruise desk. These reviews were conducted by Timothy J. Bechtold ("Bechtold"), Operations Manager for Tampa reservations, and occurred on or about November 23, 1994, January 20, 1995, and

[2]The Declaration of Timothy J. Bechtold is attached hereto at Tab 2.
[3]Horvath was not a supervisor or manager, but rather a reservation sales agent like Moore. (Bechtold Decl. at ¶ 7, footnote 1).

2

February 24, 1995.[1] (Moore Dep. at 192, 201, 248; Bechtold Decl at ¶ 8).

    10.    Each of Moore's three probationary review meetings was memorialized by Bechtold in memoranda dated November 23, 1994 ("November Memo"), February 1, 1995 ("February Memo"), and March 3, 1995 ("March Memo"). (Moore Dep. at Ex. 7, Ex. 8, Ex. 9; Bechtold Decl. at ¶ 9; Ex. 1, 2, and 3).

    11.    Moore acknowledges receipt of the November Memo, February Memo, and March Memo, and the fact that she and Bechtold met on three occasions to discuss the issues memorialized in the training review memoranda. (Moore Dep. at 192, 201, 248).

    12.    Moore has no complaints about her training or how she was treated with respect to the cruise desk up through November 23, 1994. (Moore Dep. at 192).

    13.    Moore's training prior to November 23, 1994 was considered to be "ahead of expectations." (Bechtold Decl. at ¶ 12 Moore Dep. at Ex. 7).

    14.    While there were areas noted in Moore's training review of November 23, 1994 where improvement was needed, Moore's overall "work performance [was] very good" and Bechtold informed Moore that "we are committed to giving you the best possible instruction and materials available through the remainder of the training process." (Bechtold Decl. at ¶ 13; Moore Dep. at Ex. 7).

    15.    Moore was reminded in her November Memo to let Bechtold or her "trainer know if there is anything more we can do to ensure your continued success through the remainder of your probation period." (Bechtold Decl. at ¶ 14; Moore Dep. at Ex. 7).

    16.    At Moore's second probationary review on January 20, 1995, Bechtold informed

[1]Moore's probationary review period was initially scheduled to last approximately 90 days. However, because Moore's first two training reviews were so dissimilar, Bechtold decided to extend Moore's training period for an additional 30 days. (Bechtold Decl. at ¶ 17).

Moore that despite her "first review [being] very favorable, indications are that your performance has since fallen off in some significant ways." (Bechtold Decl. at ¶ 15; Moore Dep. at Ex. 8).

17.    As of January 20, 1995, Moore had been training on the cruise desk for 17 weeks, but because of her lack of progress, had gotten through only 50% of the total material required for successful completion of the training period. (Bechtold Decl. at ¶ 16; Moore Dep. at Ex. 8).

18.    Moore's second probationary training review on January 20, 1995 concluded with Bechtold offering to extend Moore's probationary review period an additional thirty days and to set up a "refresher" on the material covered so far in the training period. Bechtold also informed Moore that should she "have any questions or concerns, [that she should] feel free to speak to [him]." (Bechtold Decl. at ¶ 20; Moore Dep. at 239, Ex. 8).

19.    Moore requested that Al Porras, a reservation sales agent working the cruise desk, provide her the refresher course. Porras worked with Moore for at least half a day going over the things Moore wanted clarified. (Moore Dep. at 325-326).

20.    Bechtold's February Memo provided a list of some of the problems and errors with Moore's performance since her first probationary training review on November 23, 1994.[5]

---

[5]The "problems and errors" contained in the February Memo, which were discussed with Moore on January 20, 1995 are:

"-    You quoted a higher fare than necessary on an itinerary overcharging a customer and creating a customer confidence issue.

-    On two other sailings you failed to quote the higher applicable fare costing NW $100 on each of those transactions, $200 total.

-    You left incomplete work on your desk and went on vacation failing to pass the work on to someone else to complete. Eventually the cruise line sent another set of the sailing information and another agent apologized that we "lost the information" and booked the space. Afterwards we discovered the space you had booked and we had to go back spending more time to cancel the duplicate seats. Time was wasted and another customer confidence issue was created.

-    A request for space out of [Grand Forks, ND] was incorrectly booked by you from [Grand Rapids, MI] The problems this creates are obvious if not caught by someone else before the travel date.

4

(Bechtold Decl. at ¶ 18; Moore Dep. at Ex. 8)

21.     Moore does not deny that the "problems and errors" contained in the February

Memo occurred, with the exception that she denies leaving work on her desk when she went on

vacation. (Moore Dep. at 213-234).

22.     The "problems and errors" contained in the February Memo was not a complete list

of the problems discovered in Moore's work since her first training review on November 24, 1994.

(Bechtold Decl. at ¶ 19; Moore Dep. at Ex. 8).

23.     On February 24, 1995 Bechtold and Moore met to discuss her performance during

---

-     You failed to advise the cruise line of space the passengers wanted us to book out
      of [Fort Lauderdale, FL]. The cruise line ticketed to the 'default' city, [Miami],
      and the airport had to reaccommodate the passengers as we were not actually
      holding confirmed space out of [Miami] for them.
-     On the same sailing you omitted a booking for a passenger from [Billings, MT],
      leaving someone down the line to scramble to accommodate them.
-     While the cruise line's fax (used to firm the space they are holding) did not include
      space from MSP, you confirmed 28 seats back to them from the original block
      without even questioning them on it. This is a basic concept of working the 60 day
      flight firm. Your job is to try to free up space the cruise lines don't confirm to us at
      this point. Failing to understand this concept ties up a huge amount of inventory
      and can create large revenue losses if the unused space is not released for resale.
      You have been working on this concept for over 12 weeks and should understand it
      thoroughly by now.
-     You missed one name on a record and duplicated another. The confusion this
      created at the airport for the "missing" passenger created ill-will and delayed
      handling until the airport could clear it up.
-     You booked a wrong return date for 2 passengers. When they showed up at the
      airport on the correct date, we had to overbook the class of service to accommodate
      them. This meant giving up full "Y" class seats that potentially could have been
      sold to walk-up traffic or other high yield business passengers. The difference in
      the air/sea fare they paid and the fare applicable for those seats meant a potential
      loss of $514.00 in revenue. You also booked them on an invalid routing and used
      the wrong fare basis and ticket designator, and you failed to record who you
      booked the record with, a standard requirement in all Cruise desk PNRs. Overall,
      the problems created on this transactions prompted the cruise line agent to ask
      "What's wrong with you guys?" Obviously, a customer confidence issue as well as
      time and revenue wasted."

(Moore Dep. at Ex. 8).

the additional thirty-day training period between January 20, 1995 and February 24, 1995. (Moore Dep. at 243; Bechtold Decl. at ¶ 21).

24.    Moore does not recall anything unfair happening between January 20, 1995 and February 24, 1995. (Moore Dep. at 247).

25.    Moore does not recall anything that was said by Bechtold in the February 24, 1995 meeting because Bechtold had "tee'd me off." Moore walked out of the office where she and Bechtold were meeting because Bechtold started off very negative. (Moore Dep. at 254-55).

26.    During the February 24, 1995 meeting, Bechtold explained to Moore that her performance problems had persisted over the last thirty days since her second review on January 20, 1995, and that as a result she was disqualified from the cruise desk and reassigned to the national sales desk. (Bechtold Decl. at ¶ 22; Moore Dep. at Ex. 9).

27.    Bechtold's March Memo provided additional performance problems occurring during January and February.[6] (Bechtold Decl. at ¶ 23, Ex. 3; Moore Dep. at Ex. 9).

---

[6]The problems listed in the March Memo are:

"-    entering incorrect names or failing to add names;
-    failing to advise of a required upgrade fare on several occasions causing NW to lose significant revenue;
-    putting incorrect information in PNR headers causing confusion and difficulty in tracking and accounting;
-    failing to understand and follow flight firming procedures tying up large amounts of inventory;
-    several records were created by you with wrong origin or destination codes creating potentially serious problems in misrouting or at least a confidence issue with the cruise line if discovered in time;
-    You missed deviations which were on the fax. If this kind of mistake isn't caught by someone, these passengers end up being booked to or from the wrong airport, creating major customer service issues and usually requires rebooking on an OAL at a great expense to NW;
-    Since the review I became aware of a complaint from a cruise line client who expressed concern with the number of errors they were finding in your work after 20weeks of training."

(Moore Dep. at Ex. 9).

28.     Moore does not dispute that the performance issues listed in her March Memo occurred. (Moore Dep. at 257-58).

29.     Moore's disqualification did not affect her employment with Northwest as a reservation sales agent. Moore's compensation and benefits remained the same regardless of whether Moore worked on the cruise desk or the national sales desk. (Bechtold Decl. at ¶ 24; Moore Dep. at 131).

30.     Moore claims that she was disqualified because she had too much seniority, and also because "they didn't want any blacks." (Moore Dep. at 285).

31.     Moore alleges that the other reservation sales agents that worked the cruise desk were worried that they would not get Christmas off because Moore had more seniority. (Moore Dep. at 281).

32.     Moore's belief that she was discriminated against because of her race is "[b]ecause I was treated much differently - - not as fairly as I saw whites were treated in respect." (Moore Dep. at 285).

33.     Moore alleges that on two occasions she was treated differently than white employees: (1) Karen Whitley, a white cruise desk agent, and Moore were working the same flight, and Moore had filled out a form for that flight the same way Whitley had filled out her form. Moore observed that her work was the same as Whitley's, however, Whitley told Moore she could not use that particular flight that "yours is wrong, mine is right." (Moore Dep. at 35, 36, 40, 286-88); and (2) Moore along with several other cruise desk agents were left to work while other cruise desk agents went to Miami for a Christmas party. (Moore Dep. at 288).

34.     Moore admits that Whitley was a cruise desk agent and not a manager, and that

7

nobody in management ever said anything to Moore to suggest that management thought Moore was wrong and Whitley was right. (Moore Dep. at 46, 287).

35.     Moore admits that there were white cruise desk agents that did not go to the Christmas party, but who stayed to work like Moore. (Moore Dep. at 288).

36.     Moore also alleges that she is aware of mistakes other white cruise desk agents made because she would hear them talking and also witnessed them correcting their mistakes. (Moore Dep. at 262, 273).

37.     Moore recalls a mistake made by a white female cruise desk agent where she apparently booked approximately 20 passengers on an incorrect flight and another white female cruise desk agent corrected the mistake. (Moore Dep. at 186, 278-80).

38.     Moore remembers that Betty Wooten, a white cruise desk agent, made the correction for the 20 passengers booked on the incorrect flight. (Moore Dep. at 280).

39.     Moore is not aware if anyone with management had knowledge of the mistake concerning the 20 passengers booked on an incorrect flight. (Moore Dep. at 280).

40.     Moore also recalls M. J. Lucas, a white cruise desk agent, making a mistake where Lucas put a passenger on a wrong flight. Moore overheard Lucas say, "Oh, I entered the wrong flight." (Moore Dep. at 274). Moore also heard Lucas say the name, date, and flight number, so Moore pulled up the flight on her computer and saw that the correction had been made by Lucas. (Moore Dep. at 274-76).

41.     Moore is not aware of anyone in management being aware that Lucas made this mistake. (Moore Dep. at 277).

42.     Moore is not aware of anybody in management ever knowing or hearing about any

8

error made by any cruise desk agent other than Moore. (Moore Dep. at 280).

43.     Following her disqualification from the cruise desk position, Moore filed a grievance with the International Association of Machinists and Aerospace Workers ("IAM" or "Union") on February 27, 1995 alleging that her disqualification violated the agreement between the IAM and Northwest.[7] (Moore Dep. at 336, Ex. 11).

44.     Following the grievance procedure, which included meetings between Moore, Bechtold, and an IAM representative Scott Peterson, Bechtold presented Moore with correspondence dated July 11, 1995, which offered Moore another eight-week opportunity to train on the cruise desk. (Bechtold Decl. at ¶¶ 25, 26; Moore Dep. 337, Ex. 12).[8]

45.     Moore recalls the effort by Northwest to resolve her grievance regarding the cruise desk position, however, Moore turned down Northwest's offer of a second training period because she "thought it was a big set up." (Moore Dep. at 339-40; Bechtold Decl. at ¶ 27).

46.     Moore filed a charge of discrimination with the City of Tampa Office of Community Relations ("City of Tampa") on March 15, 1995 alleging racial discrimination in violation of Title VII based on unequal treatment in her disqualification from the cruise desk ("1995 Charge"). (Moore Dep. at Ex. 3).

47.     Moore received a Notice of Right to Sue on or about December 2, 1997 from the Equal Employment Opportunity Commission ("EEOC") as a result of her 1995 Charge. (Moore Dep. at Ex. 4).

48.     Moore did not file suit within 90 days of receiving the Notice of Right to Sue on

---

[7] As a Northwest employee, Moore was represented by the IAM.
[8] Moore admits that she may have received Exhibit 12, although she does not remember specifically. (Moore Dep. at 337). However, Moore testified that if she did receive Exhibit 12 she probably threw it away. (Moore Dep. at 344).

9

her 1995 Charge. (Question: " . . . . And you did not file any lawsuit against Northwest Airlines within 90 days of when you received Exhibit 4 [Notice of Right to Sue dated December 2, 1997], correct?" Answer: "Correct.") (Moore Dep. at 119).

49.    Moore filed a second charge of discrimination, dated November 12, 1997, with the EEOC in Atlanta as part of a class action effort in Atlanta alleging race and gender discrimination ("1997 Charge"). (Moore Dep. at 119-21, Ex. 5).

50.    Moore admits that she did not go to the EEOC with regard to her 1997 Charge, but rather that a lawyer wrote up the 1997 Charge, mailed it to Moore, and that she signed it. (Moore Dep. at 124).

51.    Moore does not recall a situation that prompted her to file the 1997 Charge. (Moore Dep. at 122).

52.    Moore does not recall anything occurring at Northwest that she considered unfair, improper, or discriminatory between the time of her disqualification from the cruise desk in February 1995 and her filing the 1997 Charge on or about November 12, 1997. (Moore Dep. at 130).

53.    Moore received a Notice of Right to Sue on or about October 16, 1998 as a result of her 1997 Charge. (Moore Dep. at Ex. 13). Moore cites this "right to sue" as the condition precedent to this case. (Complaint at ¶ 11).

54.    Moore is not aware of any black employees who wanted to work on the cruise desk prior to Moore successfully bidding on the cruise desk position in October 1994. (Moore Dep. at 187).

55.    Moore does not know anybody who applied for the cruise desk after her

10

disqualification in February 1995 other than Stan Brian. Brian is an African-American male who bid on a cruise desk position and successfully completed his probationary training. (Moore Dep. at 190).

Respectfully submitted,

CARY SCHWIMMER
Tennessee Bar No. 14026
W. TERRY SMITH, JR.
Tennessee Bar No. 19179

KIESEWETTER WISE KAPLAN
 SCHWIMMER & PRATHER, PLC
2650 Thousand Oaks Boulevard
Suite 2200
Memphis. Tennessee 38118
Voice: (901) 795-6695
Fax:    (901) 795-1646
E-mail: cschwimmer@kiesewetterwise.com
E-mail: tsmith@kiesewetterwise.com

ATTORNEYS FOR
NORTHWEST AIRLINES. INC.

KENNETH W. WATERWAY
Florida Bar No. 0994235
HEINRICH GORDON HARGROVE
WEIHE & JAMES, P.A.
500 East Broward Boulevard - Suite 1000
Fort Lauderdale, Florida 33394-3092
Voice: (954) 527-2800
Fax: (954) 524-9481
Email: kwatrway@heinrichgordon.com

LOCAL COUNSEL FOR
NORTHWEST AIRLINES, INC.

11

## CERTIFICATE OF SERVICE

I do hereby certify that on this _____ $9^{7H}$ _____ day of March, 2001, one true and correct copy of the foregoing was served via U.S. Mail, first class postage pre-paid, upon:

> Jacob A. Rose
> The Rose Law Firm, P.A.
> 215 Fifth Street
> Suite 305
> West Palm Beach, Florida 33401

Counsel for Plaintiffs

By: _____

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3
           Case No. 00-6079-Civ-Dimitrouleas/Johnson
 4

 5
     BLANCHE BENFORD, CLAVEDIA BROS,
 6   and MADIE MOORE,

 7                 Plaintiffs,          ORIGINAL

 8   vs.

 9   NORTHWEST AIRLINES, INC.,

10              Defendants.

11   _____/

12

13                         500 East Broward Boulevard
                           Friday, January 12, 2001
14                         9:15 a.m. - 5:31 p.m.

15

16   APPEARANCES:

17   THE ROSE LAW FIRM, P.A.
     BY:  DEBRA ROSE, ESQ.
18   Attorney for the Plaintiffs

19   KIESEWETTER, WISE, KAPLAN, SCHWIMMER & PRATHER, PLC
     BY:   CARY SCHWIMMER, ESQ.
20                 - and -
     NORTHWEST AIRLINES
21   BY:  MELISSA SEPPINGS, ESQ.
     Attorneys for the Defendants
22

23
                       VIDEOTAPED DEPOSITION
24                             OF
                          MADIE MOORE
25                          VOLUME I
```

```
 1    the exact month, but I did recall, I move out in
 2    December of 1996, because I was there for six
 3    years and, um --
 4         Q.    Okay.  And was that a home or an
 5    apartment?
 6         A.    That was a home.
 7         Q.    Did you own it?
 8         A.    No.  I was leasing with the option to
 9    buy.
10         Q.    Okay.  And then Kelly Road; is that
11    what you said?
12         A.    Yes.  That's an apartment.
13         Q.    And when did you live there?
14         A.    Um, I believe, let's see.  A couple of
15    years, so '88 to '90.
16         Q.    All right.  Does anyone, uh, live with
17    you at your current address?
18         A.    Yes, my son.
19         Q.    And what is his name?
20         A.    His name is, M-I-G-U-E-L.
21         Q.    And how old is he?
22         A.    He is 22.
23         Q.    What's your, uh, birth date?
24         A.    February 2nd, 1949.
25         Q.    And where were you born?
```

```
 1    agent in Tampa Florida, in the reservation
 2    department there.
 3         Q.    Okay.  And just for, um, clarification.
 4    Um, my understanding would be that you're in Tampa
 5    yourself as a reservation sales agent from March,
 6    1987 through, um, May of 19 -- actually, through --
 7    yeah, through May of 1999 --
 8         A.    April.
 9         Q.    -- does that sound right to you?
10         A.    April, yeah, that's -- April 30th,
11    that's the same.
12         Q.    Okay.  And now, and after that, um,
13    you went to Memphis for awhile as a ticket sales
14    agent; is that correct?
15         A.    That's correct.
16         Q.    Um, and then in April of 2000, went to
17    Atlanta as a stock clerk?
18         A.    That's also correct.
19         Q.    Okay.  All right.  So Randy Holland
20    worked at the same place as you did?
21         A.    Right.  He and his wife.
22         Q.    In Tampa?
23         A.    Um-hum.
24         Q.    All right.  And what knowledge, um, or --
25    does, um, Randy Holland have regarding Tim Bechtold
```

1    anything?

2         A.    Well, I didn't say she didn't witness

3    anything.  She, she witnessed a lot, I mean, we

4    were there, we were in the same office.  As far as

5    treatment, she know the treatment that was going

6    on, as far as I was concerned and other agents or

7    black and white type deal, she knew it wasn't

8    right.

9         Q.    All right.  What did she see occur

10   that related to you?

11        A.    I can't think of anything at the

12   moment.  I have to get back to you on that one.

13        Q.    And then on Randy -- going back to

14   Randy Holland, um, besides the fact that you don't

15   know the name of the white person who he saw

16   making the same mistake as you, what mistake did

17   he see the white person make?

18        A.    Okay.  Well, see, now that's what I'm

19   saying.  It was, it was with Stacy's mistake on my

20   part was when that person -- what it was, it was a

21   flight, and I'm trying to go back remember in

22   1994, '95 is what I'm saying.  We were working

23   flights, and there was a certain way you had to do

24   it, we were working flights for cruise ships.  And

25   there was a certain way you had to formulate the

```
1    flights together, and we had to make sure we had a
2    percentage, so many we can let on the flight, you
3    know, we had a block, we have so many block for
4    passengers, so many block for people who were
5    going on cruises; so that was the frustration.
6              But it was some type of form we had,
7    and she said, "Why don't you do it this way?"  And
8    I did it, and then I looked over here, we were
9    working the same flight.  I said, "Well" -- then
10   he saw it, too, and he said, "this is" -- she said
11   your's is right, your's is wrong.  I went to her,
12   I said, "Well, this looks just like your's.  So
13   why is mine's right and your's wrong?"
14        Q.    Who is the "her" you're referring to?
15        A.    That's what I'm trying to tell you, I
16   can't remember which person it was.
17        Q.    You're saying you're talking to this
18   white woman --
19        A.    No, no
20        Q.    -- about the fact that your's was the
21   same as her's?
22        A.    Yeah, yeah.  He just happened to be
23   over there and so that's what he saw, you know.
24        Q.    You're saying Randy Holland saw this?
25        A.    Right.
```

```
 1    number, I remember the flight number, the date and
 2    the city papers, and what she was talking about --
 3    okay. I think, while I'm thinking about it, she
 4    was telling me I couldn't use that particular
 5    flight.
 6         Q.    She being this white woman?
 7         A.    Right.
 8         Q.    Another reser -- another cruise, uh --
 9         A.    Cruise agent.
10         Q.    Cruise agent?
11         A.    Yeah --
12         Q.    Okay.
13         A.    -- I couldn't use that flight. I'm
14    goin', "Well, why can't I let you use that flight?"
15    Because you can only use so many people from
16    certain flights. But, we had a passenger going
17    same way same day, and I looked at her, I
18    said, "Well, I have the same flight." I had the
19    same flight that she had. She said, "But your's
20    is wrong and mine is right." I mean, she didn't
21    say, "mine is right", she just said it is wrong;
22    meaning, hers is right. And I went, "How can it
23    be wrong?" And we get the same, same flight, we
24    use the same flight. And I, according to my
25    formula, I had not gone over the number of
```

```
 1    your paper that day?
 2         A.    No.
 3         Q.    Is there anyone that --
 4         A.    It's a joke.
 5         Q.    I'm sorry?
 6         A.    It's a joke.  I'm just saying that --
 7    I start laughing because management -- it was,
 8    supervisors in management, it's like everybody was --
 9         Q.    Ma'am, my question is whether anybody
10    in management spoke to you about that paper?
11         A.    No.
12         Q.    Okay.
13         A.    My question is, no
14         Q.    Okay.
15         A.    My answer is, no.
16         Q.    All right.  Now, um, in terms of your
17    comparing what you were doing on your paper to
18    what this white woman was doing on her paper, uh,
19    did anyone in management say anything to you
20    either before that or after that which would
21    suggest that management thought, or was saying
22    that what you were doing on your paper was wrong?
23         A.    No.
24         Q.    Uh, is there anything else that Randy
25    Holland witnessed regarding your situation?
```

```
1          Q.     Have you ever been fired, or
2     discharged, or asked to leave any job?
3          A.     No.
4          Q.     Now, do you have any sources of income
5     other than your income from Northwest Airlines?
6          A.     No.
7          Q.     Now, you began at Northwest in 1982,
8     correct?
9          A.     Incorrect.
10         Q.     That's incorrect?
11         A.     (Witness nods.)
12         Q.     When did you start with -- at
13    Northwest Airlines or Southern Airways or whatever
14    it was?
15         A.     '71.
16         Q.     '71, okay.  Um, that's correct.  I'm
17    sorry.  I was looking at the wrong thing.  August
18    5th, '71?
19         A.     Yeah, that's just --
20         Q.     All right.  And the cruise desk
21    situation was, um, in what year?
22         A.     It originated in '94 and terminated in
23    '95.
24         Q.     Up until the, uh, situation with the
25    cruise desk, um, position, is there anything that
```

```
 1        A.     No, I do not.
 2        Q.     Would it have been shortly after
 3   December 2n, 1997?
 4        A.     I would think so.
 5        Q.     Okay.  And you did not file any
 6   lawsuit against Northwest Airlines within 90 days
 7   of when you received Exhibit 4, correct?
 8        A.     Correct.
 9               MR. SCHWIMMER:  This will be Exhibit 5.
10               (Charge of Discrimination dated
11            September 22, 1997, received and marked
12            Defendant's Exhibit 5.)
13        Q.     Would you look at Exhibit 5 and tell
14   me if you can identify it?
15        A.     March 22?
16        Q.     I'm sorry?
17        A.     I'm saying the date here.
18        Q.     Do you recognize Exhibit 5?
19        A.     Well, barely.  I recognize my
20   signature anywhere.
21        Q.     Is that your signature in the lower
22   left-hand corner?
23        A.     (Witness nods.)
24        Q.     Yes?
25        A.     It definitely is.
```

```
 1            Q.     And when did you sign this?
 2            A.     9/22/97 --
 3                   (Whereupon the stenographer requests
 4            clarification.)
 5                   THE WITNESS:  I'm sorry 9/22/97.  It
 6            says here.
 7            A.     Now, this -- this is familiar -- I
 8      mean, my signature and everything, but I'm trying
 9      to figure out, who did I do this with?  9/22/97.
10            Q.     Just for clarification, this at the
11      top says, Charge of Discrimination, uh, EEOC,
12      charge no. 110980648; is that correct?
13            A.     That's what it says.
14            Q.     Okay.  Continue on.
15            A.     I was trying to understand something
16      here.  I remember this case because that was an
17      initial signing on the charge of discrimination on
18      the No. 3.
19            Q.     When you say "this case", you mean
20      Exhibit 3?
21            A.     Right.
22            Q.     You remember that one?
23            A.     Right.
24            Q.     But what about Exhibit 5?
25            A.     I'm trying to --
```

```
 1           A.      This had to come, totally different.
 2    Totally different.    That's my signature, I can't
 3    deny that.
 4           Q.      Other than seeing your signature --
 5           A.      Um-hum.
 6           Q.      -- do you have any recollection of
 7    this document?
 8           A.      Only -- of course, the number wouldn't
 9    mean anything to me, but where it says number of
10    employees, I do -- I don't, where it has 600, it
11    has approximately 600 here.    All the phone numbers
12    match, the address -- well, this, we're talking
13    about three years ago, almost four.
14           Q.      Do you even recall filing this charge
15    with the EEOC?
16           A.      Oh, I did.    I did file a charge with
17    the EEOC, I know I did.    But did I do -- this says
18    I did another one, right?
19           Q.      Exhibit 5 says you filed a second
20    charge after Exhibit 3.    My question is, whether
21    you remember even filing Exhibit 5 with the EEOC?
22           A.      I knew this one I did.    I don't recall
23    putting in approximately 600 agents, but, you
24    know, everything here has my address on it.
25           Q.      My question is whether you --
```

```
1              A.      I don't recall doing it.

2              Q.      You don't?

3              A.      No, I don't.

4              Q.      Do you even, until you saw this, did

5      you recall that you ever, um, had any charge, any

6      charge filed with the EEOC on your behalf after

7      Exhibit 3?

8              A.      No.  I remember -- well, I'm trying to

9      think of something, maybe this was -- something

10     that was -- I don't -- I don't recall this.  I

11     really don't.  I'm not trying to be --

12             Q.      No, that's fine.  I just need to know

13     what your answer is.  Is your answer that you

14     don't recall Exhibit 5?

15             A.      I don't recall the situation that

16     prompted me to do this.  I know what prompted me

17     to do this.

18             Q.      This being Exhibit 3?

19             A.      Exhibit 3, right.

20             Q.      You know what prompted you to do

21     Exhibit 3?

22             A.      Oh, yes.  Oh, yes.

23             Q.      But you don't know what prompted you

24     to do Exhibit 5; is that correct?

25             A.      It must have been something else, um --
```

```
 1          Q.      Do you recall that happening?
 2          A.      Yes.
 3          Q.      Papers that have been prepared without
 4    any assistance or direction from you; is that
 5    correct?
 6          A.      That's right.
 7          Q.      Something about -- something that just
 8    came from a lawyer's office that their office
 9    wrote up and you signed; is that right?
10          A.      I read it and signed it, yes.
11          Q.      All right.  Um, now, the, um, charge
12    number in the upper right-hand corner of Exhibit 5
13    is 110980648, correct?
14          A.      Correct.
15          Q.      At some point after September 22,
16    1997, you were telephoned by, um, someone with the
17    EEOC, correct?
18          A.      Not to my knowledge, I can't remember
19    that.
20          Q.      Do you deny that someone from the EEOC
21    telephoned you?
22          A.      I'm not denying that.  I can't recall
23    it.
24          Q.      Do you recall anyone calling you
25    regarding, um, Exhibit 5, charge number 110980648
```

```
 1          A.     No.
 2          Q.     All right.  Um, is there anything else
 3    that occurred between the time you were
 4    disqualified from the cruise desk in September
 5    22nd, 1997, which was unfair, improper or
 6    discriminatory in your mind?
 7          A.     I cannot recall anything else.
 8          Q.     All right.  And subsequent to
 9    September 22nd nineteen -- or since September
10    22nd, 1997 through today, uh, is there anything
11    that has occurred, um, regarding you at Northwest,
12    which you believe was improper, unfair or
13    discriminatory?
14          A.     The, um, disqualification with CSA.
15          Q.     That you told me about already?
16          A.     Right.  That's all I can think of.
17          Q.     And, again, you never filed a charge
18    with the EEOC regarding that, correct?
19          A.     No.
20          Q.     No, you didn't file one?
21          A.     I did not file one.
22          Q.     Okay.  Other than the, uh, cruise desk
23    position, and the customer service agent position,
24    that you told me about, are there any other
25    occasions when you requested a promotion, or a
```

1    transfer to a job that you did not receive?

2         A.    Not that I can recall.

3         Q.    With re --

4         A.    You're talking almost 30 years.

5         Q.    With regard to the cruise desk

6    position, um, would that position, had you been

7    allowed to take it, involve any increase in pay?

8         A.    No.

9         Q.    Any increase in compensation of

10   benefits of any kind?

11        A.    No.  Well, compensation would have

12   been on the telephone, that's the only, you know,

13   when I talked to a passenger all the time, mental

14   conversation I guess you'd call it.

15        Q.    And the, um, customer service agent

16   position in, uh, you said that was 1999; is that

17   right?

18        A.    Correct.

19        Q.    Would that have involved any increase

20   in pay or benefits?

21        A.    Increase in pay --

22        Q.    How much?

23        A.    -- same benefits.  Um, at that time,

24   not a whole lot.  I think, approximate, it's only

25   an approximate, approximate, a dollar more per

```
 1   complete the training to have the job permanently?
 2        A.    Once you trained, um, originally, then --
 3   I don't think you had anymore training at that
 4   point.
 5        Q.    Yes.  But what I'm saying, was it part
 6   of the deal that you had to successfully complete
 7   the training?
 8        A.    Yes.
 9        Q.    Before getting the job permanently?
10        A.    Right, right.
11        Q.    All right.  And, uh, as part of the,
12   um, training process, did you receive something
13   called, uh, training reviews?
14        A.    Yes, I had those.
15        Q.    Okay.  And was that a standard part of
16   the process that there would be three such
17   reviews?
18        A.    That's when they started that.  They
19   didn't have it before, they picked someone and
20   trained them before.  They, they changed
21   qualifications it seems when two blacks, you know,
22   the normal procedure for that job prior to the two
23   of us applying, was that they chose two people
24   that they knew, or buddies, or whatever, and, uh,
25   trained them for the job.  And, you know, they
```

```
 1        A.     I had problems with M.J. Lucas, she's
 2   no longer there, but she, she was one of my
 3   problems.
 4        Q.     I'm not asking who you had problems
 5   with.  I'm asking you the names of the people who
 6   were selected for this position prior to your
 7   being --
 8        A.     I'm giving it to you.  I'm giving it
 9   to you.
10        Q.     Was M.J. Lucas one of those people?
11        A.     That is correct.
12        Q.     Okay.
13        A.     Oh, gosh, there's another girl, I can
14   see her.  Cathy.  Cathy, Cathy, Cathy Ryan.
15               Those are the ones I can remember, I
16   think that's about it.
17        Q.     Those are the people you know of?
18        A.     Um-hum.
19        Q.     Yes?
20        A.     Yes.
21        Q.     What is Betty Wooton's race?
22        A.     Everybody I named is Caucasian.
23        Q.     Were you aware of there being any
24   black, um, cruise desk agents prior to you and
25   Mattie Jenkins?
```

DOWNTOWN REPORTING   (954) 522-3376

```
1           A.      There were none.

2           Q.      Never at anytime?

3           A.      No, no.  Only the, um, group desk, but

4    not the cruise desk.

5           Q.      What's the group desk?

6           A.      That's ten or more people.  But at the

7    time, they were, like, group desk was transferred

8    somewhere, so it's not in Tampa.  When we, um,

9    applied.

10          Q.      Had it been in Tampa prior to when you

11   applied for the cruise desk position?

12          A.      Yes.

13          Q.      And you're saying there were black

14   agents on that job?

15          A.      One.

16          Q.      Who is that?

17          A.      Judy Jackson.  She was -- they would

18   pull her periodically, she was -- anyway, it was

19   Judy Jackson.

20          Q.      Are you aware of anyone prior to your,

21   um, bid on the cruise desk job, anyone who's black

22   who had, um, wanted the cruise desk position prior

23   to when you bid on it?

24          A.      No one.  I'm not aware of anyone, no

25   one voiced an opinion.
```

```
 1    later occasions, as a result of the bid process?
 2         A.    Yes.
 3         Q.    What if any information do you have as
 4    to the training those individuals received?
 5         A.    I have no information.
 6         Q.    Do you have any information as to
 7    whether those individuals had the same type of
 8    training reviews that you had?
 9         A.    No, I do not.
10         Q.    Can you identify people who, um,
11    successfully bid on the cruise desk job after you
12    did?
13         A.    I only know of one person offhand and
14    he's now in the hospital with a aneurysm, and that
15    is Stan Brian.
16         Q.    What was his race?
17         A.    Black.  He was the only black ever.
18         Q.    He was black, was that your answer?
19         A.    The only black, yes, that's my answer.
20         Q.    He was the only black of what?
21         A.    That was selected for that position.
22    I don't know anybody else at that time who, um,
23    even applied.  I know he was the only one -- there
24    was somebody else, but who it was, I can't
25    remember.  I do remember him.
```

```
1          A.     Yes, I do.
2          Q.     Is this a memorandum you received from
3   Tim Bechtold, um, regarding your training on the
4   cruise desk?
5          A.     Right.   This was a third day review,
6   so it meant I had to start like October.  A month
7   before, but I remember this, yes.
8          Q.     And this is dated November 23rd, '94?
9          A.     Um-hum.
10         Q.     Yes?
11         A.     Yes, it is.
12         Q.     Do you have any complaints about how
13  you were dealt with on this cruise desk job up
14  through the date of this review?
15         A.     No.
16         Q.     And do you have any objections to or
17  disagreements with Exhibit 7?
18         A.     No.
19         Q.     Was there, um, an IAM representative
20  present with you for each review you got from Mr.
21  Bechtold?
22         A.     As far as I can remember, there was.
23  I know the last one there was.
24         Q.     And who was that?
25         A.     Uh, the third review was Sherlock
```

```
 1          Q.     So you never heard anything about
 2    there being a set time that you were supposed to
 3    have to train on the job?
 4          A.     No.
 5          Q.     And --
 6                 MR. SCHWIMMER:  And this will be
 7          Exhibit 8.
 8                 (Training Review Memorandum dated
 9          February 1, 1995, received and marked
10          Defendant's Exhibit 8.)
11          Q.     Is Exhibit 8 your second review, and
12    to have a probationary review that is dated.
13    February 1, '95 and given to you by Tim Bechtold?
14          A.     Correct.
15          Q.     Prior to when this second review was
16    presented to you --
17                 THE VIDEOGRAPHER:  Going off the video
18          record.
19                 (Whereupon there was a brief
20          interruption.)
21                 THE VIDEOGRAPHER:  Back on video record.
22          Q.     Now, was there somebody assigned to
23    train you in this cruise desk job?
24          A.     Shawna Howarth.
25                 (End of Volume I)
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3

                Case No. 00-6079-Civ-Dimitrouleas/Johnson
 4

 5

    BLANCHE BENFORD, CLAVEDIA BROS,
 6  and MADIE MOORE,

 7              Plaintiffs,              ORIGINAL

 8  vs.

 9  NORTHWEST AIRLINES, INC.,

10              Defendants.

11  _____/

12

13                        500 East Broward Boulevard
                          Friday, January 12, 2001
14                        9:15 a.m. - 5:31 p.m.

15

16  APPEARANCES:

17  THE ROSE LAW FIRM, P.A.
    BY:  DEBRA ROSE, ESQ.
18  Attorney for the Plaintiffs

19  KIESEWETTER, WISE, KAPLAN, SCHWIMMER & PRATHER, PLC
    BY:   CARY SCHWIMMER, ESQ.
20  Attorney for the Defendants

21

22                    VIDEOTAPED DEPOSITION
                              OF
23                        MADIE MOORE
                          VOLUME II
24

25
```

```
1                 REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA      )

4    COUNTY OF BROWARD     )

5

6               I, Judith M. Caputo, Shorthand

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of MADIE

9    MOORE, that a review of the transcript was not

10   requested; and that the transcript is a true and

11   complete record of my stenographic notes.

12

13               I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorneys or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19

20               DATED this 22nd day of January, 2001.

21

22                         _____

23                         Judith M. Caputo
                           Notary Public - State of Florida
24                         My Commission Expires:  12-27-03

25
```

DOWNTOWN REPORTING    (954) 522-3376

```
1         Q.     Okay.   And, um, Exhibit 8, this
2    Probationary Review II, says that, um, on January
3    20, 1995, um, that you and Tim, um, met in your
4    office and that Scott Peterson was present; is
5    that accurate?
6         A.     That's correct.
7         Q.     Prior to -- strike that.
8                Between the time you, um, successfully
9    bid, uh, to train for the cruise desk position,
10   and January 20, 1995, did anything occur, uh,
11   during your training period that you feel was
12   problematic or improper?
13        A.     Well, for one thing, that really -- I
14   never could understand, he encourage us to ask --
15   he, meaning, Tim, encourage us to ask questions,
16   we ask questions, you're asking too many
17   questions.   You knew you were going to have
18   questions, okay, that is one problem I had with
19   him.
20        Q.     With who?
21        A.     With Tim.
22        Q.     You're saying that between the time
23   you bid on the job and January 20th, there was an
24   occasion when you were told you were asking too
25   many questions?
```

```
 1          A.      I can't remember.
 2          Q.      It then has a list of items, first one
 3    it says is, "You quoted a higher fare than
 4    necessary on an itinerary, overcharging a customer
 5    and creating a customer confidence issue."
 6                  Did Mr. Bechtold discuss that with
 7    you?
 8          A.      I don't remember.
 9          Q.      And did you in fact do what it says
10    that you did here?
11          A.      I don't remember that.
12          Q.      The next line says, "On two other
13    sailings, you failed to quote the higher
14    applicable fare costing Northwest $100 on each of
15    those transactions, $200 total."
16                  Did Mr. Bechtold discuss that with
17    you?
18          A.      I don't remember that either.
19          Q.      And is this accurate as to what you did?
20          A.      I don't remember that.
21          Q.      The next entry says, "You left
22    incomplete work on your desk and went on vacation
23    failing to pass the work on to someone else to
24    complete.  Eventually, the cruise line sent
25    another set of the sailing information and another
```

```
1    agent apologized that we" -- quote -- "lost the
2    information" -- close quote -- "and booked the
3    space.  Afterwards we discovered the space you had
4    booked, and we had to go back, spending more time
5    to cancel the duplicate seats.  Time was wasted
6    and another customer confidence issue was
7    created."
8                   Did Mr. Bechtold discuss this
9    paragraph with you on January 20th?
10        A.    I remember this.  Now --
11        Q.    Does that mean he did discuss it with
12   you?
13        A.    Yes.
14        Q.    Okay.  And --
15        A.    But I want to say something to this,
16   too.
17        Q.    Well, you need to answer my
18   questions.
19        A.    I said, "yes".
20        Q.    Okay.  Is what Mr. Bechtold stated
21   here, accurate as to what you did?
22        A.    What, what is stated here, no.
23   Because no one told nothing -- not to pass on the
24   work to anyone else.  And I don't recall failing
25   to pass work to someone else to complete.  I went
```

```
 1    on vacation, he knew I was going on vacation.  If
 2    there was anything to do, no one came to me.  I
 3    don't even recall this.  We talked about it.  But
 4    why leave what needs to be done, on a desk and go
 5    on vacation, that's stupid.
 6         Q.    What's stupid that you left --
 7         A.    To leave it.  Yes, that would be
 8    stupid to do that.
 9         Q.    Are you saying you did not --
10         A.    I'm saying I did not.
11         Q.    You did not leave incomplete work on
12    your desk?
13         A.    No, because even -- no.  It was a
14    bunch of setup.
15         Q.    Did Mr. Bechtold describe to you what
16    incomplete work he was referring to?
17         A.    No, I don't recall.
18         Q.    Did you ask him?
19         A.    I don't recall that.
20         Q.    You don't recall if you asked him?
21         A.    No, I don't.  I recall him asking me,
22    going over with me, the type work you're talking
23    about.
24         Q.    I'm asking whether you asked Mr.
25    Bechtold what incomplete work he was referring to?
```

```
 1            A.      I don't remember if I did or not.
 2            Q.      Okay.  Um, is there anything else in
 3    that paragraph, uh, the third entry on the first
 4    page of Exhibit 8, that is not accurate?
 5            A.      I don't recall quoting a higher fare
 6    than necessary.  We're, we're trained to quote the
 7    most economical fare on all itineraries.
 8                    So what it says here, "you quote a
 9    higher fare"; I don't -- that's not normal, that's
10    not me.
11            Q.      Are you back on the second entry that
12    says, "on two other sailings you failed to
13    quote" --
14            A.      I'm back to number one.
15            Q.      You're back to number one?
16            A.      Yeah.
17            Q.      "You quoted a higher fare than
18    necessary"?
19            A.      Um-hum.
20            Q.      Okay.  Are you changing your testimony
21    on that now?
22            A.      I'm not changing anything.  I'm just
23    saying, I don't recall quoting -- I didn't -- I
24    recall talking to anybody to say I did quote a
25    higher fare.  I don't recall quoting a higher
```

```
 1    fare, because that's not something that I normally
 2    do.
 3            Q.      Do you deny doing what it says there?
 4            A.      Yes, I deny it.
 5            Q.      So you did not quote a higher fare
 6    than necessary?
 7            A.      I did not quote a higher fare than
 8    necessary.  But we supposed to quote the lowest
 9    fare, we be trained liked at.
10            Q.      And what, uh, customer was he
11    referring to?  Do you know?
12            A.      I have no idea.
13            Q.      Do you have any documentation showing
14    you did not quote a higher fare?
15            A.      I don't have it in here, either, no, I
16    do not.
17            Q.      What fare did you quote?
18            A.      Okay.  Let me explain something to
19    you.  This, what fare did I quote?  There's no
20    idea, there's no fare here to tell us what was
21    going on.  I don't remember what fare was quoted
22    back when.  You're talking about January, um,
23    '95?  No, uh, it had to be between the 23rd of
24    November to the December, to January 20th, okay?
25    So that was like two months in between my last
```

```
 1    review and this second review.
 2                And then he told us that it would be
 3    every 30 days, but this is like every 30 days --
 4    no, I don't remember.  I don't remember.
 5         Q.    Okay.  You don't know what fare you
 6    quoted; is that correct?
 7         A.    That is correct.
 8         Q.    Uh, now, you're saying that you did
 9    not quote a higher fare than necessary because you
10    were trained on it, is that --
11         A.    We were trained to give the most
12    economical fares in any given market.  So why
13    would I quote a higher fare in that, in that
14    particular case?
15         Q.    Could you have made a mistake?
16         A.    We all make them, it's a possibility,
17    but I try not to.
18         Q.    I understand you try not to, but how
19    do you know that you did not quote a higher fare
20    than necessary?
21         A.    Because I don't have anything,
22    documentation saying that I did or did not.
23         Q.    Other than that, do you have any basis
24    for saying you did not quote a higher fare than
25    necessary?
```

```
1              A.    That's all.
2              Q.    And what if any discussion did you
3     have with Tim Bechtold regarding this entry that
4     says you quoted a higher fare than necessary on an
5     itinerary overcharging a customer and creating a
6     customer confidence issue?
7              A.    I don't remember our conversations, I
8     don't.  But that's just, no, I don't remember.
9              Q.    And back to the third entry about
10    leaving incomplete work.
11             Other than what you've told me, is
12    there anything else in that paragraph that is not
13    accurate as to what occurred?
14             A.    See, this is a bunch of -- never
15    mind.
16             You know, he was saying, you know the
17    passing along work.  If there was work to be done,
18    I don't take work home, then they called the
19    cruise line apologizing and say they lost the
20    information.  It wasn't lost, if I did leave
21    anything to return a call, it wouldn't have been
22    lost, no.
23             Q.    It says, "Eventually the cruise line
24    sent another set of the sailing information and
25    another agent apologized that" -- quote -- "we
```

```
 1   lost the information" -- close quote -- "and
 2   booked the space."
 3            Do you know whether or not that
 4   occurred?
 5       A.   No.
 6       Q.   Is there anything else in that
 7   paragraph that you do not feel is accurate as to
 8   what took place?
 9       A.   I'm just taking a look at this --
10   looking at it now.  This is really, um, so what
11   I'm saying, there's some work to be done.  And I
12   thought, if I pass the work on to someone else to
13   complete, then they call upon and say we lost
14   information, you didn't lose the information, if
15   the information was, if anything was done.  It, it
16   just doesn't make any sense to me.  Doesn't make
17   any sense, that it was passed on.
18       Q.   Well, let's start at the beginning of
19   the paragraph and we'll stay until we get through
20   it.
21            First sentence says, "You left
22   incomplete work on your desk and went on vacation
23   failing to pass the work on to someone else to
24   complete."
25            Now, am I understanding that you did
```

```
 1   not leave incomplete work on your desk?
 2        A.    I don't -- I don't recall leaving
 3   anything incomplete on desk.
 4        Q.    Do you deny leaving incomplete work on
 5   your desk?
 6        A.    I deny it, yes, I do.
 7        Q.    Was anything left on your desk when
 8   you went on vacation?
 9        A.    No.  I didn't leave -- I try to take
10   care of everything before I leave, before I go
11   anywhere.
12        Q.    Well, did you pass work on before you
13   left?
14        A.    Before I left, there was nothing to
15   pass on.  Evidently, I didn't have anything.
16   That's what I'm trying to figure out here now.
17        Q.    Are you saying you did not have any
18   incomplete work?
19        A.    I don't recall having any incomplete
20   work on my desk prior to going on vacation.
21        Q.    Do you deny having any incomplete work
22   on your desk?
23        A.    I do not recall having any incomplete
24   information on my desk.
25        Q.    I'm asking you whether you deny having
```

```
 1   incomplete work on your desk --
 2              MS. ROSE:  I am going to object.  The
 3         question has been asked and answered,
 4         counsel.  You're badgering the witness.
 5         Q.    Okay.  You need to answer.
 6              Do you deny leaving incomplete work on
 7   your desk?
 8         A.    I do not recall that.
 9         Q.    Is that your answer?
10         A.    That's my answer.  That's my final
11   answer.
12         Q.    And you understand I was asking you if
13   deny that or not, correct?
14         A.    That's my final answer.  Yes, I do.
15         Q.    And your final answer to that question
16   is that you do not recall?
17         A.    That's what I said, yes.
18         Q.    Okay.  And, um, do I also understand
19   that you do not recall whether you passed work on
20   to someone else to complete?
21         A.    I do not -- I don't recall this
22   either, no.  So I'm saying, I do not recall the
23   situation.
24         Q.    You do not recall the situation at all --
25         A.    Right.
```

```
 1          Q.     -- that he was referring to?
 2          A.     Right.
 3          Q.     And you do not recall any discussion
 4   with him about it; is that correct?
 5          A.     We talked about this, this whole
 6   review, but, but -- I could not talk -- never, I
 7   do not recall the whole conversation with him.  We
 8   don't -- we had to go over this, because he gave
 9   it to me.
10          Q.     Yes?
11          A.     Right?
12          Q.     Right.  And what was said regarding
13   the third paragraph that begins with the words,
14   "you left incomplete work"?
15          A.     I don't have any idea.
16          Q.     Okay.  The next --
17          A.     Because I didn't sign anything, as you
18   very well see here.
19          Q.     Ma'am, I'm not asking if you signed
20   anything --
21          A.     Um-hum.
22          Q.     -- I'm asking, do you recall anything --
23          A.     No, I do not recall.
24          Q.     You need to let me finish my question.
25                 Do you recall anything that was said
```

```
 1   by you to Tim Bechtold or by Tim Bechtold to you,
 2   regarding the paragraph that begins, "You left
 3   incomplete work on your desk"?
 4        A.    I do not.
 5        Q.    The next entry says, "A request for
 6   space out of GRF was incorrectly booked by you
 7   from GRR."
 8              What does "GRF" stand for?
 9        A.    Great Falls.
10        Q.    And what is --
11        A.    Wait a minute.  GR -- there's no --
12   they got -- that's even wrong.  This is GFR.  See,
13   this is wrong, there's no GRF.
14        Q.    Ma'am, is your answer that there is no
15   GRF?
16        A.    Right.  Oh, my God.
17        Q.    Do you know --
18        A.    Hold it.  That's Great Falls.  That's
19   crazy.
20              Okay.  Grand Rapids, I'm trying to
21   think.
22              (Whereupon the stenographer requests
23        clarification.)
24        A.    I don't do airline codes that much any
25   more.  I'm saying this looks wrong.
```

225

```
 1         Q.    My question was whether you know what
 2    GRF is?
 3         A.    No, because --
 4         Q.    Let me move on to the next question.
 5               Do know what --
 6               THE VIDEOGRAPHER:   I have to change
 7         tapes.
 8         A.    There's no such thing.
 9         Q.    Let him change the tape.
10               THE VIDEOGRAPHER:   We're going off
11         video record.  End of Tape No. 2.
12               (Whereupon a discussion was held off
13         the record.)
14               THE VIDEOGRAPHER:   We're back on video
15         record at 3:11.  Tape No. 3 of videotaped
16         deposition of Madie Moore.
17         Q.    I was asking you about the code, GRF,
18    and are you saying there's no GRF?
19         A.    There's no GRF.
20         Q.    And do you know what GRR is?
21         A.    That's Grand Rapids, Michigan.
22         Q.    Okay.  And where it says, "a request
23    for space"; what is meant by "space"?
24         A.    Flight.  Um, the flight number being
25    available.  A certain flight being available, a
```

```
 1    seat.  In other words, space is a seat.
 2         Q.    Okay.  And --
 3         A.    And what can happen --
 4         Q.    -- and where it says, uh, that a
 5    request for space out of, um, GRF was incorrectly
 6    booked by you from GRR, um, setting aside that you
 7    don't know what GRF was, was there a situation at
 8    this time where you incorrectly booked a request
 9    for space as being from GRR?
10         A.    Well, that could have happened.  That
11    happens all the time.  I'm not the only one -- you
12    know, I won't deny anything like that, because
13    they're very close together, code wise.  People
14    book them out of Jackson, Mississippi; Jackson,
15    Tennessee.  They do that all the time, but that's --
16    I try to be very careful with that.  That's a
17    possibility, I can make a mistake, because I'm
18    human.  I won't deny I could've done that.  But
19    I'm trying to figure, the GRRF is Great Falls,
20    Great Falls, GTF what is GRF?
21         Q.    It doesn't matter.
22         A.    Well, anyway --
23         Q.    You don't deny --
24         A.    I don't deny it could have happened.
25    That's what I'm saying, I don't recall the
```

```
 1   situation, I'm not denying it could have happened.
 2        Q.      Are you aware of other people, uh,
 3   incorrectly booking space as coming from the wrong
 4   location?
 5        A.      It happens quite frequently, every
 6   day.
 7        Q.      Okay.  Tell me who you have personally
 8   witnessed doing that?
 9        A.      I haven't said witnessed.  I can pull
10   a reservation up, of somebody who already booked
11   something, if a passenger calls in and they call
12   back to make any type of change, I could see it.
13   I don't recall the person's name, the sign,
14   agent's sign on the computer.  I don't know
15   anybody's name, but I'm saying it happens
16   periodically.
17        Q.      And are you aware of whether the
18   occasions where that has happened, the company
19   spoke to the agent responsible about it?
20        A.      I'm quite sure they did.  I, I haven't
21   seen it.  I just try to correct it.  I wasn't
22   trying to look for nobody, I just go in and change
23   it, try to correct the problem.
24        Q.      The next entry on the next paragraph
25   of Exhibit 8 says, "You failed to advise the
```

1    cruise line of space the passengers wanted us to

2    book out of FLL."

3              Did Mr. Bechtold talk to you about

4    that?

5         A.    Probably --

6         Q.    And is --

7         A.    But I don't recall.

8         Q.    And is it true that you did that or is

9    it not true that you did that?

10        A.    "You failed to advise the cruise line

11   of space the passengers wanted us to book" -- how

12   could I -- I mean, I got to show you something.  I

13   don't recall that at all.

14        Q.    Are you saying you don't --

15        A.    No.

16        Q.    -- recall whether that happened or

17   not?

18        A.    No, I don't.

19        Q.    And it then says, "The cruise line

20   ticketed to the default city, MIA, and the airport

21   had to re-accommodate the passengers, as we were

22   not actually holding confirmed space out of MIA

23   for them."

24             Did Mr. Bechtold talk to you about

25   that?

```
 1           A.      I don't recall that, that entire
 2    paragraph.
 3           Q.      And is what he states there accurate
 4    as to what occurred?
 5           A.      I don't recall the entire paragraph.
 6           Q.      Okay.  You don't recall one way or the
 7    other?
 8           A.      No, I don't.
 9           Q.      The next entry, um, says, "On the same
10    sailing, you omitted a booking for a passenger
11    from BIL leaving someone down the line to scramble
12    to accommodate them."
13                   Did Mr. Bechtold talk to you about
14    that?
15           A.      I don't recall.
16           Q.      And is that accurate as to what
17    occurred?
18           A.      I don't recall.
19           Q.      Uh, on the top of the second page of
20    Exhibit 8 says, "While the cruise line's fax used
21    to firm the space they're holding, did not include
22    space from MSP, you confirmed 28 seats back to
23    them from the original block without even
24    questioning them on it."
25                   Did Mr. Bechtold talk to you about
```

```
 1     that?
 2          A.     I don't recall.  This is ludicrous.
 3     This is crazy.
 4          Q.     And is this accurate as to what
 5     occurred?
 6          A.     No.
 7          Q.     You're saying this did not happen?
 8          A.     I don't -- uh-huh, um-hum.
 9          Q.     You're denying that that happened?
10          A.     I'm denying this happened.
11                 (Whereupon the stenographer requested
12          clarification.)
13          Q.     You need to speak up and speak more
14     clearly.
15          A.     Okay.  I'm looking at where it says,
16     you confirmed 28 seats back to them from the
17     original block without even questioning them on
18     it.  Questioning, what is?  This is a bunch of
19     bull, no.  I did not.
20          Q.     Okay.  Uh, so you did not confirm 28
21     seats back to them?
22          A.     I do not recall confirming 28 seats.
23     See, this sounds ludicrous.  I'm just saying, I do
24     not remember doing something, all this stuff they
25     said that is in here.  You know, and that's why
```

```
 1   I -- that's why we're here today.
 2        Q.    Okay.  I understand that you don't    .
 3   remember it.  Do you deny --
 4        A.    I do not remember.
 5        Q.    Okay.  Is your answer that you don't --
 6        A.    I do not remember.
 7        Q.    Ma'am, you're going to have to let me
 8   finish my questions or we're going to be here an
 9   awful long time.
10             If you're not prepared to answer my
11   questions, you need to tell your counsel and I can
12   to talk to her about it.
13             Do we need to suspend the deposition
14   or will you allow me to finish my questions?
15        A.    You can finish your question.
16        Q.    Now, are you denying that -- strike
17   that.
18             Am I understanding correctly, that you
19   don't recall one way or another whether you did
20   what the first line at the top of the second page
21   of Exhibit 8 says you did?
22        A.    That is correct.
23        Q.    Okay.  Uh, it then says, "That this is
24   a basic concept of working the 60-day flight
25   firm."
```

```
 1               Do you know what a 60-day flight firm
 2    is?
 3        A.      It's just they're saying, 60 days
 4    prior to flight, prior to the flight leaving, they
 5    want to make sure that they still want the space,
 6    that's all that means.
 7        Q.      And is that a basic concept?
 8        A.      Yeah.
 9        Q.      Then it says, "Your job is to try to
10    free up space the cruise lines don't confirm to us
11    at this point"; is that correct?
12        A.      Yes, that's correct.
13        Q.      Uh, then says that, "Failing to
14    understand this concept ties up a huge amount of
15    inventory and can create large revenue losses if
16    the unused space is not released for resale."  Is
17    that true?
18        A.      That's true.
19        Q.      And then it says, uh, "You have been
20    working on this concept for over 12 weeks and
21    should understand it thoroughly by now."  Is that
22    true?
23        A.      Correct.
24        Q.      The next entry says, "You missed one
25    name on a record and duplicated another."
```

```
 1                    Did Mr. Bechtold talk to you about
 2    that?
 3         A.     I don't recall.
 4         Q.     Do you know one way or another whether
 5    you did this?
 6         A.     I don't recall.
 7         Q.     It then says, "The confusion this
 8    created at the airport for the" -- quote --
 9    "missing" -- close quote -- "passenger created
10    ill-will and delayed handling until the airport
11    could clear it up."
12                    Did Mr. Bechtold talk to you about
13    that?
14         A.     I don't recall.  I don't recall any of
15    this.  I'm just looking over it.
16         Q.     All right.  But do you know one way or
17    another whether that actually occurred?
18         A.     I don't recall.
19         Q.     The next entry begins by saying, "You
20    booked a wrong return date for two passengers."
21                    Uh, did Mr. Bechtold discuss that with
22    you?
23         A.     I don't recall this either.
24         Q.     And do you recall one way or another
25    whether you did this?
```

```
 1          A.      No, I don't recall.
 2          Q.      And it then says, "When they showed up
 3    at the airport on the correct date, we had to
 4    overbook the class of service to accommodate
 5    them."
 6                  Do you know if that's true or not?
 7          A.      No, I don't recall.
 8          Q.      It then says, um, "This meant giving
 9    up full "Y" class seats that potentially could
10    have been sold to walk up traffic or other high
11    yield business passengers."
12                  Um, do you know if that occurred?
13          A.      I don't recall.
14          Q.      It then says, "The difference in the
15    air/sea fare they paid, and the fare applicable
16    for those seats meant a potential loss of $514 in
17    revenue."  Do you know if that's true?
18          A.      I don't recall any of this, as I told
19    you.
20          Q.      It then says, "You also booked them
21    on an invalid routing and used the wrong fare
22    basis and ticket designator, and you failed to
23    record who you booked the record with.  A standard
24    requirement in all cruise desk PNR's."  Do you
25    know if that's true or not?
```

1    demonstrate a marked improvement in your

2    performance within the next 30 days to be able to

3    continue at the desk."

4            Did you discuss that with Mr. Bechtold?

5        A.    Yes, I did.

6        Q.    And what was said about that?

7        A.    Just what he just read.  That's what

8    we going to do.  We going to try to go another 30

9    days.

10       Q.    All right.  Did you disagree with that

11   being done?

12       A.    No, I did not.

13       Q.    Uh, the next paragraph says, "You

14   demonstrated an excellent grasp of the material in

15   the first review and your work habits were quite

16   acceptable at that stage."  I'm sorry.  Let me say

17   that again.

18           "You demonstrated an excellent grasp" --

19   I think it should say -- "of the material in the

20   first review and your work habits were quite

21   acceptable at that stage.  The work is exacting

22   and demanding and is not suited to everyone.  As a

23   sales agent, you've demonstrated you have the

24   talent and ability to contribute to the success of

25   Northwest Airlines.  In light of that, we are

```
 1        A.      I'm just saying, the date on here, we
 2   talking about it prior to that time.  I'm just
 3   looking at the apartment.
 4        Q.      Prior to what time?
 5        A.      Okay.  Here it is, the 24th.  The 4th
 6   of February.  I'm just looking at the dates here
 7   on, on this --
 8        Q.      The memo is dated --
 9        A.      -- the first letter, the first line,
10   it says March 3rd is when it was dated.
11        Q.      Yes.  So the first sentence
12   says, "This IOC will confirm the substance of your
13   third probationary review for a cruise desk
14   position, which was held in my office on February
15   24, 1995."
16               Did he meet with you, Mr. Bechtold,
17   on, uh, February 24, '95?
18        A.      Yes.
19        Q.      And did you receive Exhibit 9 on or
20   about March 3rd, '95?
21        A.      Evidently.  Yes.
22        Q.      Okay.  Now, um, was a Union
23   representative present in your meeting with
24   Mr. Bechtold of February 24th --
25        A.      Sherree Andrews.
```

```
 1    "incorrect names or failed to add names" --
 2         Q.      Are you talking about something that
 3    occurred during that period?
 4         A.      Yeah.
 5         Q.      Okay.  Tell me what occurred.
 6         A.      Well, I'm just looking back at this.
 7              Where it says, "entering names or
 8    failing to add names" -- on something, I don't
 9    recall any, you know, not adding a person's name,
10    because that was, that was something I ask him
11    to -- because at one point an agent was supposed
12    to be doing that, was behind and I doing it,
13    whatever, I said, I would come in Saturdays to,
14    um, add names to my itinerary because --
15         Q.      Ma'am, I'm not asking you about what
16    you don't recall.  I'm asking you what occurred
17    between January 20th and February 24th, 1995,
18    which you believe to be improper or unfair.
19         A.      I don't recall.
20         Q.      And, um, with regard to Exhibit 9, uh,
21    referring to your meeting with, uh, Mr. Bechtold
22    on February 24, 1995, the memo begins by saying,
23    "This IOC will confirm the substance of your third
24    probationary review for a cruise desk position
25    which was held in my office on February 24, 1995."
```

```
1    Does IOC mean interoffice correspondence?

2         A.    Correct.

3         Q.    Um, the next paragraph says, "I showed

4    you a large number of your work errors and

5    problems which are ongoing from the previous

6    review."

7              Did Mr. Bechtold, on February 24,

8    1995, show you work errors and problems?

9         A.    On what date?

10        Q.    When he met with you on February 24,

11   1995?

12        A.    Yes.  We went over some problems, yes.

13        Q.    Okay.  It then says, "I found you were

14   not clear on concepts you should be well versed in

15   from over 20 weeks of training or practice on the

16   desk."

17             Did he tell that to you when he met

18   with you?

19        A.    I don't recall.

20        Q.    Then it says, "The training process

21   has historically been an eight-week program."

22             Do you know whether or not that's

23   true?

24        A.    Hum.  I don't recall it being an

25   eight-week program at all.
```

254

```
 1          A.      I would talk to Pat Wagner sometimes
 2   about some stuff that I needed verification on.
 3          Q.      I'm talking about during your meeting
 4   with Mr. Bechtold on February -- on January 20th,
 5   '95 or immediately thereafter, did you spend
 6   anytime with Mr. Bechtold or anybody else going
 7   over things that you wanted clarified?
 8          A.      No.
 9          Q.      All right.  And getting back to
10   Exhibit 9, the memo of March 3rd, 1995, uh, the
11   third paragraph says, um, "Some of the problems we
12   discussed occurred over several weeks in January
13   and February and involved" -- and then the first
14   item is, "Entering incorrect names or failing to
15   add names."
16               Do you recall whether Mr. Bechtold
17   discussed that with you on February 24th, '95?
18          A.      When I was in this room with Mr.
19   Bechtold, I don't recall anything because he had
20   really tee'd me off.  So what he had to say, I got
21   this piece of paper, and walked out of his
22   office.  Okay?  So you don't have to ask me no
23   questions about this paper, because I don't
24   remember nothing.
25          Q.      Okay.  Well then to --
```

```
 1         A.    The Union rep was in there with me,
 2    you can ask them.
 3         Q.    Well, then just to shorten my
 4    questioning with respect to Exhibit 9, is it your
 5    testimony with regard to what Mr. Bechtold states
 6    in Exhibit 9, that you do not recall one way or
 7    another, whether he went over with you on February
 8    24th, '95, the items that are listed in Exhibit 9?
 9         A.    My answer to you is, he started
10    talking and I don't recall anything he said,
11    because he started off very negative, and I had
12    already read this.  I just told him, I'll see him
13    later.
14         Q.    You're saying you met with Mr. Bechtold
15    on February 24th, '95 and he handed you Exhibit 9?
16         A.    That's how I got it.
17         Q.    Why is Exhibit 9 dated March 3rd, '95?
18         A.    That's what I was asking you earlier.
19         Q.    Well, I wasn't there, you were.
20         A.    That's what I'm saying, it was -- I
21    was in his office the 24th of February, but it was
22    dated for March.
23         Q.    Did he hand you Exhibit 9 on February
24    24th?
25         A.    No.  I don't -- you know, I don't know
```

1    I got ready to walk out.

2         Q.    Okay.  Is it your testimony then that

3    you don't know whether or not you were listening

4    to Mr. Bechtold in your meeting with him of

5    February 24th, 1995?

6         A.    I was listening to him to a certain

7    extent.

8         Q.    Okay.  Tell me when you began

9    listening.  And tell me when you stopped

10   listening.

11        A.    When he start babbling, about

12   nothing.  And that was in the middle of the

13   conversation.

14        Q.    Okay?

15        A.    So I just left.

16        Q.    All right.  Now, getting back to

17   Exhibit 9, what I was asking you, whether it was

18   your testimony, as to all the items that Mr.

19   Bechtold has listed in Exhibit 9, that you do not

20   recall, one way or another, whether he went over

21   these items with you on February 24th, '95?

22        A.    That is correct, that's my answer.

23        Q.    Okay.  And is it also your testimony

24   as to Exhibit 9, a memo dated March 3rd, '95, as

25   to all the items that Mr. Bechtold, um, lists in

```
 1   here, including what he's referring to as problems
 2   that you don't recall one way other another, as to
 3   whether or not you made the errors that he has
 4   listed here?
 5        A.    That is correct.
 6        Q.    Okay.
 7              MR. SCHWIMMER:  Could you read back
 8        the last question and answer, please?
 9              (Whereupon the requested portion of
10        the transcript was read.)
11        Q.    And do you have an understanding from --
12   strike that.
13              In the meeting with Mr. Bechtold on
14   February 24th, 1995, did the Union representative
15   say anything?
16        A.    As I told you before, Scott Peterson
17   was in there, and he agreed to try to further the,
18   um, training period.  He was in there when I
19   requested a new trainer, but of course that never
20   happened.
21        Q.    This was on February 24, '95?
22        A.    That is correct.
23        Q.    The day you were disqualified?
24        A.    No, no, no, no.  I'm sorry.
25              That was in January.  Second review,
```

```
 1 │ that.
 2 │           Are you aware of white, um, people
 3 │ working on the cruise desk, uh, making, uh,
 4 │ errors?
 5 │     A.    Of course.  I've seen it happen.  As a
 6 │ matter of fact, I might have something in the
 7 │ paperwork somewhere on one of them because the
 8 │ whole cruise ship was messed up and I told someone
 9 │ about it.  But see, the thing about it, they would
10 │ cover up for each other.  I asked --
11 │     Q.    I don't need a whole story.
12 │     A.    Well, I have seen it.  Yes, I have --
13 │     Q.    Okay.
14 │     A.    -- many times.
15 │     Q.    Okay.  You said there was a whole
16 │ cruise ship that was messed up?
17 │     A.    Well, I shouldn't say whole cruise
18 │ ship.  It was a flight, into a flight that, uh,
19 │ was going out, people going out on a cruise, they
20 │ had booked it incorrectly.  And so --
21 │     Q.    You really need to let me --
22 │     A.    Okay.
23 │     Q.    -- ask you the questions.
24 │     A.    Okay.
25 │     Q.    Okay.  You said there was a flight
```

```
 1              Q.      You're saying --
 2              A.      Well, you know, they talk among
 3     themselves.  You can hear them talking.  "Oh, I
 4     just messed up.  I put this on the wrong" -- I
 5     listen as well as look, okay?  So I know that
 6     happened.
 7              Q.      Did you observe this, or were you told
 8     about it?
 9              A.      I heard her talking about it, and then
10     out of curiosity, because I know the games they
11     play, when the records are in, I can always go
12     back in and pull them up.  You know, when you
13     hear -- you hear them talking about the
14     conversation, you hear giving the information
15     about the flight, getting the dates of the name of
16     the person, all you got to do is pull it back up.
17              Q.      Did you pull up the records following
18     hearing about this error?
19              A.      I always do.
20              Q.      Is your answer "yes"?
21              A.      Yes.  My answer is, yes.
22              Q.      Okay.  Now, first of all, who did you
23     hear it from that M.J. Lucas has made this error?
24              A.      She -- they talk.  I just told you,
25     she said it herself.
```

```
 1              Q.      Tell me what she said.
 2              A.      Oh, I entered the wrong flight.    I
 3      have Mr. Jones on --
 4              Q.      Ma'am, you're going to have to speak
 5      slowly --
 6              A.      I'm sorry.
 7              Q.      -- and you need to speak up.
 8              A.      All I'm saying is she was excited, she
 9      got excited, so I was trying to give you verbatim
10      what she said.  I got excited, I had put Mr. Jones
11      on -- I'm giving you hypothetically.
12              Q.      No, no.  You need to slow down,
13      because nobody can understand what you're saying.
14              A.      I'm talking the way she was talking.
15      Okay.  She was saying I booked Mr. Jones on the
16      wrong flight, and he's supposed to be on the
17      10th -- the 10th and not the 11th.  And then, uh,
18      he's supposed to be -- then she just call it the
19      flight, he's supposed to be on flight such and
20      such and such.  And that's all I need, the name,
21      the date and the flight and the last name.
22              Q.      So she stated the name, the date and
23      the flight?
24              A.      No, they -- yes.
25              Q.      What dates did she say?
```

```
 1          A.     I just told you, hypothetically, the
 2     10th.  I don't know exactly what dates.  I can't
 3     remember that.  You don't expect me to remember
 4     all that, I hope.
 5          Q.     So you're saying she blurted out I
 6     booked him --
 7          A.     Yeah.  On the --
 8          Q.     Ma'am you need to let me finish --
 9          A.     -- 10th of January instead of the
10     11th.
11          Q.     Ma'am, you need to let me finish my
12     question.
13          A.     Okay.  Go ahead.
14          Q.     Did M.J. Lucas blurt out the name of
15     the individual, the date, uh, of the -- and the
16     date of the flight, and the number of the flight?
17          A.     I just told you that.  I just said,
18     the 10th or the 11th, I've changed Mr. Jones was
19     on flight, blah, blah, blah.  I had him on the
20     10th, he's supposed to be on the 11th, and that's
21     all you needed.
22          Q.     And who was M.J. Lucas referring to?
23          A.     The people.
24          Q.     I'm sorry.  Who was M.J. Lucas
25     speaking to?
```

A. Just in general to her coworkers. They do it all the time, because they -- it was real close -- it was close as this, okay? And so they always talking.

Q. Did, um, was Jones the name of the passenger?

A. No. I said hypothetically. I used Jones.

Q. And you say you then went and pulled up records?

A. Um-hum. Because they were --

Q. Is that a "yes"?

A. That's a yes.

Q. Did you print out those records?

A. No, because I'm in -- you in training, you try and --

Q. Is your answer, "no"?

A. My answer is no, not that particular -- I did take something to Tim, he wouldn't accept it. My answer to that situation is, no.

Q. And at when you pulled up the records, what did you see?

A. The changed, the correct flight number that's was supposed to be on it, like she said. You can look in the history and tell what was

```
 1    changed.
 2        Q.     And did you ever speak to anyone about
 3    this?
 4        A.     Every time, I told you, I said
 5    something, they cover up for each other.
 6               Yes, I talked to Carol Coleman once,
 7    this is my manager -- a supervisor.
 8        Q.     About this particular error by M.J.
 9    Lucas?
10        A.     I don't recall that particular error.
11        Q.     My question is about the --
12        A.     I don't recall that particular error
13    by M.J. Lucas, I do not.  But I haven't spoken to
14    her.
15        Q.     Are you aware of anyone in management
16    being aware that M.J. Lucas made this mistake?
17        A.     No, I'm not aware of anyone in
18    management.
19        Q.     Are you aware of any other errors that
20    M.J. Lucas made?
21        A.     Not at this time.
22        Q.     Are you -- what errors are you aware
23    of that Betty Wooton made?
24        A.     It was in regards to that, um, a
25    flight being booked incorrectly, also.  She and
```

```
 1   Cathy both.
 2        Q.    Well, let's stick with Betty for a
 3   second.  When -- strike that.
 4             What information do you have regarding
 5   Betty Wooton booking a flight incorrectly?
 6        A.    I had it in front of me when that was --
 7   she was involved with that situation when the lady
 8   called, remember?  When that travel agent called
 9   and changed the flight.  Betty was involved in
10   that and Cathy.
11        Q.    What situation?
12        A.    When they, they booked 20 something
13   people or more on an incorrect flight.
14        Q.    Is this the situation you told me
15   about earlier where a whole flight was booked
16   incorrectly?
17        A.    That particular flight, yes, that's
18   the one.
19        Q.    Is this the one you're telling me
20   about?
21        A.    Yes, I'm telling you.
22        Q.    Is it now your testimony that you
23   remember the names of the agents involved?
24        A.    I remember, yes.  As I talk, I
25   remember stuff, it's coming back to me, it's been
```

```
 1   many years.
 2       Q.    Right.  So now you know that those are
 3   who were involved --
 4       A.    I remember that now, yes.
 5       Q.    And were you -- and other than that
 6   situation, are you aware of any other errors that
 7   Betty Wooton or Cathy Ryan made?
 8       A.    Not at this time.
 9       Q.    And in that particular case, what
10   specific error did Betty Wooton make?
11       A.    I think Betty, per se -- Cathy was the
12   one to make the error, I believe, if I'm not
13   mistaken.  And Betty is the one that's, like, kind
14   of covering up for her.  I'm trying to see if --
15   let me see now.  If it was Cathy -- Betty is one
16   that stood up -- it wasn't Cathy, I'm sorry, it's
17   been over five or six years I'm talking now.  It
18   was Betty, she changed it.
19             Cathy was a whole different ball game,
20   I forget what Cathy did, she did something,
21   something else.  You can just scratch her out of
22   that situation, I'm sorry.  It was Betty Wooton.
23       Q.    You're saying you don't know of any
24   errors that Cathy Ryan made?
25       A.    Yeah, I know -- I don't know any off --
```

```
 1    I know some she's made, but I can't be specific as
 2    to that, there's so many. I can't say she made
 3    this, this and this. But that one, but the cruise
 4    ship stuck out in my mind, because she -- because
 5    I told her about it, and she called and changed
 6    that them. I remember that.
 7          Q.    Who called and changed them?
 8          A.    Betty. She called, the people called
 9    in to change the reservation. I went to -- when I
10    found out what was wrong, I went over and told her
11    what was wrong, and then she corrected it.
12          Q.    She being Betty?
13          A.    Betty corrected it, right.
14          Q.    And, again, you're not aware of
15    anybody in management knowing about this, correct?
16          A.    No.
17          Q.    Are you -- am I correct?
18          A.    You're correct.
19          Q.    All right. Are you aware of
20    management being aware -- strike that.
21                Are you aware of management knowing or
22    hearing about any error made by any cruise desk
23    agent other than yourself?
24          A.    No, I'm not.
25          Q.    And with regard to, um, training
```

```
 1   periods, are you aware of any, um, potential
 2   cruise desk agent being given a longer training
 3   period than you were given?
 4        A.    Not to my knowledge.
 5        Q.    And, uh, do you have a belief as to
 6   the reason or reasons that you were disqualified
 7   from the cruise desk position?
 8        A.    As I explained to you earlier, no one
 9   wants our seniority.  There were statements made
10   that they didn't want us over there because we had
11   too much seniority.  I'll never get Christmas off,
12   na, ne, na, ne, na, that was one of the thing.
13   And we had a lot of -- we had seniority what we
14   could -- anyway, I been there.  Which was selfish
15   and childish to me, I've worked holidays,
16   Christmas, Thanksgiving, you name it.  But that
17   was, you know, part of the, uh, the reason.
18        Q.    And who are you talking about?
19        A.    I'm talking about a certain agent over
20   there who was Cathy, at the time, Ryan, said that,
21   we'd never get Christmas off.  We have too many
22   people coming over here with high seniority and --
23        Q.    Wait, wait, wait.  Cathy Ryan said
24   that who would never get Christmas off?
25        A.    She, meaning herself.  She said, "I
```

```
 1              A.      I just gave you that reason.
 2              Q.      What is that reason?
 3              A.      I gave you, um, that particular
 4      office, it was due to seniority.
 5              Q.      So you believe --
 6              A.      Um --
 7              Q.      -- am I correct that you believe
 8      seniority was a reason that you were disqualified
 9      from the cruise desk?
10              A.      That was one of my reasons, I do
11      believe that.
12              Q.      Do you believe there are any other
13      reasons that the company or anybody in the company
14      disqualified you from the position?
15              A.      They didn't want any blacks so they
16      never had any, and I felt that way, too.  I felt
17      discriminated against, I'm goin' to tell you that
18      now.
19              Q.      What's your basis for believing that
20      your race had anything to do with the fact that
21      you were disqualified from the cruise desk
22      position?
23              A.      Because I was treated much differently --
24      not as fairly as I saw whites were treated in
25      respect.
```

```
 1          Q.    Anything else?
 2          A.    That's it.
 3          Q.    Now, what facts are you aware of,
 4   which would show that you were not treated as
 5   fairly as you saw whites being treated?
 6          A.    I have given you example just five
 7   minutes ago, sir.  I told you, when you tell me,
 8   we do the same type of work, same flight or
 9   something, and we have the same everything from A
10   to B, A to Z is the same, but your's is right and
11   mine is wrong.  I mean, come on.  It's just -- you
12   would have to really be in that situation to
13   understand what I'm saying because you --
14          Q.    I don't, I don't.
15          A.    -- you really don't.  And I'm trying
16   to get you to see.
17          Q.    Ma'am, I'm not interested in your
18   opinion as to whether I would need to be in that
19   position --
20          A.    I'm trying to tell you.
21          Q.    -- I need to know the facts which you
22   are aware of which indicate that you were not
23   treated as fairly as white people.
24                Now, there's specific examples that
25   you're aware of where you were not treated as
```

```
 1    fairly as a white person who did the same thing?
 2         A.    Yes.
 3         Q.    Okay.  Now, you mentioned something
 4    about Louisiana and a PRN?
 5         A.    PNR.  Person name record.
 6         Q.    PNR?
 7         A.    Right.
 8         Q.    Is that an example?
 9         A.    Yes.
10         Q.    And who was the white person?
11         A.    Karen Whitley.
12         Q.    And are you saying that Karen Whitley
13    did the same thing you did on that occasion?
14         A.    Yes.
15         Q.    And who was aware, if anyone, that
16    Karen Whitley made this error?
17         A.    She and I were aware.  You don't
18    understand.  The management doesn't seem to give a
19    darn, so why should I go to them?  This is two of
20    us, that was it.
21         Q.    And what was Karen Whitley's job?
22         A.    Cruise agent.
23         Q.    She wasn't a manager, was she?
24         A.    No.
25         Q.    Okay.  Are there any facts other than
```

```
 1    that, that you're aware of, which would indicate
 2    that you were not treated as fairly as white
 3    people?
 4         A.    You know what, I would have to sit
 5    here and think.  There are so many things in my
 6    mind right now.
 7         Q.    Regardless of what the things are in
 8    your mind, are there other facts you're aware of
 9    which would indicate that you were not treated as
10    fairly as whites?
11         A.    When you leave a person at work in
12    conditions at a busy time of the year, and let
13    other people run off and have a party, that's not
14    the same treatment.  That's, that was, that was
15    cruel.  That was very cruel.
16         Q.    You're talking about when people went
17    to this Christmas party?
18         A.    Oh, yeah.  That was very cruel.
19         Q.    Were there whites who also had to stay
20    and work?
21         A.    Very few.  The ones that wanted to.
22         Q.    Ma'am, were there whites --
23         A.    There were a few, I told you earlier,
24    yes, there were, sir.
25         Q.    Do you know whether those people
```

```
1          Q.    Is that correct?

2          A.    That's correct.

3          Q.    You requested Mr. Al Porras?

4          A.    Um-hum.

5          Q.    Yes?

6          A.    Yes.

7          Q.    Who is Al Porras?

8          A.    He was a cruise agent.  He was a very

9    good person.  He trained me in reservation on the

10   computer system when I first went to Tampa.

11         Q.    And where it says that, "Mr. Bechtold

12   agreed to have Mr. Porras do the training" --

13   um -- "and we spent half a day going over things I

14   wanted clarified."

15              What are you referring to?

16         A.    Things that I didn't quite understand

17   maybe, uh, they had a certain way you do

18   percentage of this, percentage of that, in terms

19   of, um, getting seats on a flight, and I wanted to

20   go over that equation with him.

21         Q.    With who?

22         A.    With Al Porras.

23         Q.    It says, "we spent half a day going

24   over things I wanted clarified"?

25         A.    Um-hum.
```

```
 1         Q.    Who spent half a day?

 2         A.    Mr. Porras do the training, and we

 3   spent half a day going over things I wanted

 4   clarified is what it says here.

 5         Q.    Right.  Who is the "we"?

 6         A.    Al Porras.

 7         Q.    And yourself?

 8         A.    I said Al Porras and myself, right.

 9         Q.    Spent half a day going over things you

10   wanted clarified?

11         A.    Correct.

12         Q.    Is that correct?

13         A.    That is correct.

14         Q.    Okay.  Then you say, "The next day

15   Ms. Howarth was back doing the training, which was

16   not what was agreed upon"?

17         A.    Um-hum.

18         Q.    Is that correct?

19         A.    That's correct.

20         Q.    Tell me what happened that resulted in

21   her being back doing the training?

22         A.    She just showed up.  You know, like

23   she owned the place, that's all.  She just showed

24   up the next day.

25         Q.    Did you say anything to her about it?
```

```
1          Q.     You spoke to who, Mr. Sanders?
2          A.     Yeah.
3          Q.     And tell me what was said.
4          A.     I don't remember what was said.  I
5     just told him what was, basically, what was in
6     this letter.
7          Q.     Was there anything else that was said?
8          A.     That was it.
9          Q.     And was anybody else present during
10    that conversation?
11         A.     He was the only one in there.
12                MR. SCHWIMMER:   This will be Exhibit 11.
13                (Grievance, Suspension and Discharge
14         Appeal Form dated February 27, 1995, received
15         and marked Defendant's Exhibit 11.)
16         Q.     Is Exhibit 11 a grievance that you
17    filed, uh, regarding your being disqualified from
18    the cruise desk?
19         A.     Um-hum.
20         Q.     Is this a grievance that you filed
21    regarding your disqualification from the cruise
22    desk job?
23         A.     That's correct.
24         Q.     All right.  And what happened as a
25    result of this grievance?
```

```
1          A.      Nothing.

2          Q.      There was no communication from the

3     company?

4          A.      Um-hum.

5          Q.      No?

6          A.      I don't remember.  I know they didn't --

7     I didn't get any satisfaction from them, so I just

8     forgot about them.

9               MR. SCHWIMMER:    This will be Exhibit 12.

10              (Letter dated July 11, 1995, received

11         and marked Defendant's Exhibit 12.)

12         Q.      Do you recognize Exhibit 12?

13         A.      I, I'm looking at it, I don't

14    recognize but I see it.

15         Q.      You don't recall receiving this letter --

16         A.      Um-hum.

17         Q.      -- is that correct?

18         A.      I don't recall ever seeing it.

19         Q.      Do you deny that you received this?

20         A.      No, I'm not denying it.  I'm just

21    saying I don't recall.

22         Q.      Would you pull out Exhibit 10 again

23    real fast.  Your March 21, 1995 letter to the

24    Nathan Sanders?

25         A.      Um-hum.
```

```
 1              A.      That's the only thing I recall doing,
 2      send them to the Union, I said.
 3              Q.      And which cruise desk agents were
 4      these and what errors?
 5              A.      I don't remember.
 6              Q.      Do you remember which cruise desk
 7      agents?
 8              A.      No, no, no, no.
 9              Q.      All right.  Now, Exhibit 12, um, at
10      least appears to be a letter that has Tim
11      Bechtold's, uh, name on it.  Do you recall there
12      being an attempt by the company to settle your
13      grievance regarding the cruise desk job?
14              A.      Yes, sir.  I told you earlier, they
15      wanted to go back and train four months later at
16      another busy time of the year and I told them,
17      no.  Because it was a setup, I feel like it was a
18      setup again.
19              Q.      You're saying they wanted to give you
20      another opportunity to train?
21              A.      (Witness nods.)
22              Q.      Yes?
23              A.      Yes.
24              Q.      And you said something about a busy
25      time of the year?
```

```
 1            A.    Yeah.   It was real busy, and, and I
 2     just didn't feel like that was fair to try to go
 3     into it and, and then they're claim that you're
 4     not doing this, you're not doing that.  It was a
 5     big setup, I felt.  So I didn't want to do it
 6     again.  I was just like, you know, I've tried it
 7     once at that time of the year, um, you know, given
 8     another opportunity to do it a different time, but --
 9     there's a bunch of stuff in there that's --
10            Q.    What time of the year did they want to
11     give you another opportunity to train in?
12            A.    Thanksgiving, Christmas.
13            Q.    You're saying that was the offer?
14            A.    Um-hum.
15            Q.    Yes?
16            A.    That's the offer.
17            Q.    Are you sure?
18            A.    That's what he told me.
19            Q.    That's what who told you?
20            A.    That's what Tim told me.
21            Q.    Was anybody else present?
22            A.    I think the Union person -- was he in
23     there?  Yeah, he was in there, Scott.
24            Q.    Scott was in there?
25            A.    Um-hum.
```

```
1              Q.    So you did speak to Mattie Jenkins
2      about Exhibit 12, correct?
3              A.    Yes, because they offer her the same
4      thing, basically.
5              Q.    All right.  And besides Mattie
6      Jenkins, did you speak to anyone else about
7      Exhibit 12?
8              A.    No.
9              Q.    Did you speak to the Union about
10     Exhibit 12?
11             A.    I don't think I even want to talk to
12     them anymore.
13             Q.    Uh, and what did you do with Exhibit
14     12 after you received it?
15             A.    For whatever I do with it, put it in
16     Chapter 13 probably that's --
17                   (Whereupon the stenographer requests
18             clarification.)
19             A.    Probably put it Chapter 13.
20             Q.    You put it where?
21             A.    Probably threw it away because I
22     didn't trust the Union at that point.
23             Q.    You didn't trust the Union?
24             A.    Um-hum.  I didn't want to hear
25     anything they had to say because I was really --
```

```
 1                REPORTER'S DEPOSITION CERTIFICATE

 2

 3    STATE OF FLORIDA      )

 4    COUNTY OF BROWARD     )

 5

 6              I, Judith M. Caputo, Shorthand

 7    Reporter, certify that I was authorized to and did

 8    stenographically report the deposition of MADIE

 9    MOORE, that a review of the transcript was not

10    requested; and that the transcript is a true and

11    complete record of my stenographic notes.

12

13              I further certify that I am not a

14    relative, employee, attorney or counsel of any of

15    the parties, nor am I a relative or employee of

16    any of the parties' attorneys or counsel connected

17    with the action, nor am I financially interested

18    in the action.

19

20              DATED this 22nd day of January, 2001.

21

22

23              _____

24              Judith M. Caputo
                · Notary Public - State of Florida
25              My Commission Expires:  12-27-03
```

DOWNTOWN REPORTING     (954) 522-3376

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | FEPA | 95-0066 |
| | X EEOC | 15J950024 |

| CITY OF TAMPA OFFICE OF COMMUNITY RELATIONS | and EEOC |
|---|---|

NAME (Indicate Mr., Ms., Mrs.)
MS. MADIE L. MOORE

HOME TELEPHONE (Include Area Code)
() ~ 813-884-0665

| STREET ADDRESS | CITY, STATE & ZIP CODE | | Date of Birth |
|---|---|---|---|
| 7342 BROOKVIEW CIRCLE | TAMPA, FL | 33624 | 02-02-49 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below )

| NAME NORTHWEST AIRLINES | NO. OF EMP. 40,000+ | TELEPHONE () 813 882-2900 |
|---|---|---|

| STREET ADDRESS | CITY, STATE, ZIP CODE | | COUNTY |
|---|---|---|---|
| 5729 HOOVER BLVD. | TAMPA, FL | 33634 | HILLSBOROUGH |

| NAME | | TELEPHONE |
|---|---|---|

| STREET ADDRESS | CITY, STATE & ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOXES)

[ RACE ] COLOR  SEX  RELIGION  NATIONAL ORIGIN

RETALIATION  AGE  DISABILITY  OTHER(SPECIFY)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 09-19-94 | 02-24-95 |
| Continuing Action | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

I. PERSONAL HARM

On February 24, 1995, I was subjected to unequal treatment of employment as a Cruise Agent Trainee with Respondent. I have been employed since August 5, 1971.

II. RESPONDENT'S REASON

Tim Bechtold, Assistant Manager, White, Male, stated that I was being disqualified as a Cruise Agent Trainee because of too many errors.

III. DISCRIMINATORY STATUTE(S)

I believe that I was discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

X I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under the penalty of perjury that the foregoing is true and correct

Madie L. Moore

Date  Charging Party (Signature)
March 15, 1995

NOTARY (When necessary for state and local requirements)

I swear and affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

M&cc-552 44 54 20

SIGNATURE OF COMPLAINANT

Madie L. Moore

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE.
(Day, month, and year) 15 March 1995

EEOC FORM 5 (Rev. 06/92)

DEFENDANT'S EXHIBIT NO. 3 FOR IDENTIFICATION 1-12-01

U.S. QUAL EMPLOYMENT OPPORTUNITY CO. ISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To:<br>Ms. Madie L. Moore<br>3432 Hunters Run Lane<br>Tampa, Florida 33614 | From:<br>U. S. Equal Employment Opportunity Commission<br>Tampa Area Office<br>501 E. Polk Street, Room 1020<br>RECEIVED Tampa, Florida 33602 |
|---|---|

[ ] *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))*

DEC 9 1997

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 151950024 | Lenore Nichols, Investigator<br>NWA Labor Relations | (813) 228-2310 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA): This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your suit under Title VII or the ADA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ X ] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required). EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible. If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission　*11-16-97*

*12·2·97*
*(Date Mailed)*

J. D. Packwood, Jr., Area Director

Enclosure
Copy of Charge

cc:
Northwest Airlines
James E. Voyles, Attorney at Law

DEFENDANT'S 4
EXHIBIT NO.
FOR IDENTIFICATION
1-12-01
DATE:　RPTR: JC

| CHARGE ISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form | AGENCY<br>[ ] FEPA<br>[X] EEOC | CHARGE NUMBER<br>110980648 |
|---|---|---|

_____ and EEOC
*State or Local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)*<br>Madie Moore | HOME TELEPHONE *(INC Area Code)* (813) 933-9149 |
|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>3432 Hunter Run Lane, Tampa, Florida 33614 | DATE OF BIRTH<br>02/02/49 |
|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(IF MORE THAN ONE LIST BELOW)*

| NAME<br>Northwest Airlines | NUMBER OF EMPLOYEES, MEMBERS Approx. 600 | TELEPHONE *(INC AREA CODE)* 813-887-2900 |
|---|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>5729 Hoover Boulevard, Tampa, Florida 33634 | COUNTY<br>Hillsborough |
|---|---|

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(INC AREA CODE)* |
|---|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

| CAUSE OF DISCRIMINATION *(CHECK APPROPRIATE BOX(ES))*<br>[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN<br><br>[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER *(SPECIFY)* | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST            LATEST<br><br>[X] CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(IF ADDITIONAL SPACE IS NEEDED ATTACH EXTRA SHEET(S))*

1. I am an African American and I charge that I was discriminated against because of my race in violation of Title VII
2. Employer allowed sexual harassment in the work place
3. Employer maintained a hostile working environment based on race.
4. Employer inflicted a stressful working environment.
5. Employer retaliated for complaints and grievances.
6. Northwest Airlines maintains a pattern and practice of discrimination against black employees.
7. I have exhausted my administrative remedies
8. I request a right to sue letter.

| [✓] I want this charge filed with both the EEOC and the State or local Agency, if any> I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY *(When necessary for State and Local Requirements)*<br><br>I swate or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
|---|---|

| I declare under penalty of perjury that the foregoing is true and correct<br>9-22-97<br>*Madie Moore*<br>Date        Charging Party *(Signature)* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month and year) |
|---|---|

EEOC FORM 5 (Rev 06/97)

DEFENDANT'S EXHIBIT NO. 5 FOR IDENTIFICATION  1-12-01  DATE:    RPTR:

*Interoffice Communication*



# NORTHWEST AIRLINES

To    MADIE MOORE

From    TIM BECHTOLD



Location    TPA RESERVATIONS

Subject    TRAINING REVIEW

Date    NOVEMBER 23, 1994

This IOC is a follow-up to the meeting held in my office to review your performance to date in your trainee position at the Cruise desk.

After discussing your work performance with your trainer I met with you and the following points were outlined:

1) Your progress at this point in the training is actually ahead of expectations. Congratulations!

2) You demonstrate an excellent grasp of the material presented so far, and have shown yourself to be conscientious, self-motivated and committed to the training process.

3) You appear focused and are showing good results in comprehending each new phase as it is taught. In the early phases of training, you did show some difficulty in recalling previous material after having moved on to a new topic. You agreed to make better use of the reference sheets provided to help you in the recall process. In the normal course of working the desk, you will be required to move quickly from one topic to another many times each day. Your trainer indicated just prior to our meeting you have already begun to catch on to using the sheets.

4) We touched briefly on being more conscious of others working next to you and to the customers on their phones when you finish a difficult call. You agreed to be careful not to make comments out loud that could disturb others or be overheard by customers on the phones since the headsets can pick up surrounding voices more easily when you are sitting at the linear rows as opposed to the agent pods on the sales floor.



5) Overall, your work performance is very good. You have shown sound judgement in prioritizing your work and have been thorough in completing the tasks assigned to you. I encourage you to continue to put in the kind of effort and concentration you've been showing so far. Learning all the facets of the desk can be very challenging, even frustrating. We are committed to giving you the best possible instruction and materials available through the remainder of the training process. Let me or your trainer know if there is anything more we can do to ensure your continued success through the remainder of your probation period.

*Interoffice Communication*



# NORTHWEST AIRLINES

To  MADIE MOORE

From  TIM BECHTOLD
MGR, OPERATIONS

Location  TPA RSO

Subject  PROBATIONARY REVIEW II

Date  FEBRUARY 1, 1995

On January 20, 1995 we met in my office for the second review of your work performance on the Cruise desk. Scott Peterson was present for the IAM.

While your first review was very favorable, indications are that your performance has since fallen off in some significant ways. I went over some of the problems and errors:

- You quoted a higher fare than necessary on an itinerary overcharging a customer and creating a customer confidence issue.

- On two other sailings you failed to quote the higher applicable fare costing NW $100 on each of those transactions, $200 total.

- You left incomplete work on your desk and went on vacation failing to pass the work on to someone else to complete. Eventually the cruise line sent another set of the sailing information and another agent apologized that we "lost the information" and booked the space. Afterwards we discovered the space you had booked and we had to go back spending more time to cancel the duplicate seats. Time was wasted and another customer confidence issue was created.

- A request for space out of GRF was incorrectly booked by you from GRR. The problems this creates are obvious if not caught by someone else before the travel date.

- You failed to advise the cruise line of space the passengers wanted us to book out of FLL. The cruise line ticketed to the 'default' city, MIA, and the airport had to reaccommodate the passengers as we were not actually holding confirmed space out of MIA for them.

- On the same sailing you omitted a booking for a passenger from BIL, leaving someone down the line to scramble to accommodate them.



DEFENDANT'S
EXHIBIT NO. 8
FOR IDENTIFICATION
1-12-01
DATE:   RPTR.

- While the cruise line's fax (used to firm the space they are
  holding) did not include space from MSP, you confirmed 28 seats
  back to them from the original block without even questioning
  them on it. This is a basic concept of working the 60 day
  flight firm. Your job is to try to free up space the cruise
  lines don't confirm to us at this point. Failing to understand
  this concept ties up a huge amount of inventory and can create
  large revenue losses if the unused space is not released for
  resale. You have been working on this concept for over 12 weeks
  and should understand it thoroughly by now.

- You missed one name on a record and duplicated another. The
  confusion this created at the airport for the "missing"
  passenger created ill-will and delayed handling until the
  airport could clear it up.

- You booked a wrong return date for 2 passengers. When they
  showed up at the airport on the correct date, we had to
  overbook the class of service to accommodate them. The meant
  giving up full "Y" class seats that potentially could have been
  sold to walk-up traffic or other high yield business
  passengers. The difference in the air/sea fare they paid and
  the fare applicable for those seats meant a potential loss of
  $514.00 in revenue. You also booked them on an invalid routing
  and used the wrong fare basis and ticket designator, and you
  failed to record who you booked the record with, a standard
  requirement in all Cruise desk PNRs. Overall, the problems
  created on this transactions prompted the cruise line agent to
  ask "What's wrong with you guys?" Obviously, a customer
  confidence issue as well as time and revenue wasted.

This is not a complete list of the problems discovered in your work
since the last review. But hopefully, it will help you to understand
the critical nature of the work done at the desk and the urgent need
for you to focus fully and carefully on each thing you do. Considering
the customer issues and the economic impact of failing to meet the
requirements of the desk, you will have to demonstrate a marked
improvement in your performance within the next 30 days to be able to
continue at the desk.

You demonstrated an excellent grasp if the material in the first
review and your work habits were quite acceptable at that stage. The
work is exacting and demanding, and it is not suited to everyone. As a
sales agent, you demonstrated you have the talent and abilities to
contribute to the success of Northwest Airlines. In light of that we
are committed to giving you every opportunity to see if this new work
is suited to your personality and those same abilities.

I agreed to set up a refresher of the material covered with you so
far, which is only about half of the total required. But since you
have been training or practicing for 17 weeks on only 50% of the total
material required, we will not be able to extend the process further
if you don't demonstrate proficiency in this area by the end of the 30
days mentioned above.

Despite the problems, I offer my appreciation for the efforts you have put forth to attempt to learn the procedures of the desk. I hope we can find a common solution to meeting our customers' high expectations and NWA's goals for profitability and success.

If you have any questions or concerns, feel free to speak to me.

*Interoffice Communication*

MAR 31 1995

**NORTHWEST AIRLINES**

To    MADIE MOORE

From    TIM BECHTOLD
        MANAGER, OPERATIONS

Location TPA RESERVATIONS

Subject PROBATION REVIEW III

Date    MARCH 3, 1995

This IOC will confirm the substance of your third probationary review
for a Cruise desk position which was held in my office on February 24,
1995.

I showed you a large number of your work errors and problems, which
are on-going from the previous review. I found you were not clear on
concepts you should be well versed in from over 20 weeks of training
or practice on the desk. The training process has historically been an
8 week program. At this point you have covered approximately half the
material necessary to pass probation because I instructed the trainer
not to move on until this material was mastered.

Some of the problems we discussed occurred over several weeks in
January and February and involved:

- entering incorrect names or failing to add names

- failing to advise of a required upgrade fare on several
  occasions causing NW to lose significant revenue

- putting incorrect information in PNR headers causing
  confusion and difficulty in tracking and accounting

- failing to understand and follow flight firming procedures
  tying up large amounts of inventory

- several records were created by you with wrong origin or
  destination codes creating potentially serious problems in mis-
  routing or at least a confidence issue with the cruise line' if
  discovered in time.

- You missed deviations which were on the fax. If this kind of
  mistake isn't caught by someone, these passengers end up being
  booked to or from the wrong airport, creating major customer
  service issues and usually requires rebooking on an OAL at a
  great expense to NW.

DEFENDANT'S
EXHIBIT NO. 9
FOR IDENTIFICATION
1-1201

- Since the review I became aware of a complaint from a cruise line client who expressed concern with the number of errors they were finding in your work after 20 weeks of training.

Reviewing the 30 and 60-day firming work you did since our last meeting revealed a disturbing number of errors. Considering the amount of time you have had to learn this material and the number of sailings you've worked on to gain proficiency, it is my judgement that this type of work is not suited to you. Therefore, you are disqualified from the Cruise desk and will be reassigned to National Sales effective Monday February 27, 1995.

I expressed my appreciation for your interest in the Cruise desk and for the efforts you did put forth to try your hand at a very unique but exacting job function.

This decision in no way reflects on your overall performance in reservations. It is merely an indication that your talents and abilities are better demonstrated in your prior role as a National Sales agent than as a Cruise Desk agent. I look forward to your continued success in the sales area.

DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
1-8-01
DATE:        RPTR: 1C

## GRIEVANCE, SUSPENSION, AND DISCHARGE APPEAL FORM

International Association of Machinists and Aerospace Workers
Air Transport District 143, AFL-CIO

Date: 2/27/95    Station: TAMPA    Local # 2319

Employer: NW AIRLINES    Contract: COFPS    Bid Location: TPA

Department: RSVN'S    Mgr./Supervisor Name: TIM BECHTOLD

Grievant's Name: MADIE MOORE    Employee # 102179

Home Address: 7342 BROOKVIEW CIR

City: TAMPA    State: FL    Zip Code: 24124    Home Phone (813) 884-0665

Job Title/Classification: RSVN'S SALES AGENT    Seniority Date: 8-5-71

Shift/Hours Working: I 0820-1700    Days Off: S/S    Work Phone (813) 287-2922

Grievance occurred at: (Place) TAMPA RSVN'S    at (Time) 1630 a.m./p.m. on (Date) 2/24/95

**PARTICULAR ARTICLES AND PARAGRAPHS VIOLATED** and any other applicable provisions of the contract:
ARTICLES 11, 5D, 25.4V, 25.4W, 1.1, ALL APPLICABLE STATE + FEDERAL
LAWS, AND ALL RELATED ARTICLES OF COFPS AGREEMENT

**NATURE OF GRIEVANCE:**

- DISQUALIFICATION FROM TAMPA CRUISE DESK ( A LOCAL BID AREA)

- DISCRIMINATORY, UNEQUAL TREATMENT (T EMPLOYEE DURING TRAINING

- INSUFFICIENT TRAINING

- HARASSMENT DISCRIMINATORY TREATMENT OF GRIEVANT BY COMPANY SELECT "TRAINING INSTRUCTOR"

**AS A RESOLUTION TO THIS GRIEVANCE:** AGENT: BE REINSTATED TO FORMER POSITION
AT CRUISE DESK, PROVIDED PROPER TRAINING BY A DIFFERENT TRAINING
INSTRUCTOR AGREED TO BY LOCAL COMPANY + LOCAL IAM REP, ALL
INSTANCES OF DISQUALIFICATION BE REMOVED FROM FILE, + MADE WHOLE

I hereby authorize the International Association of Machinists and Aerospace Workers, with full power of attorney, to represent me in all stages of the Grievance procedure in the presenting and settling of this grievance.

Signed: _____ (Signature of grievant)    Union Representative: _____ (Signature)

| To      LeAnn         | From.        Tim Bechtel |
|------------------------|---------------------------|
| Co/o  J. Dencer       | Co.                       |
| Dept.                  | Phone # 713  887 -2304    |
| Fax # 412  727 - 6844 | Fax #                     |

Exhibit F

July 11, 1995

Ms. Madie Moore
7342 Brookview Circle
Tampa, FL 33634

RE: IAM COFPS Grievance File # 112311
FEPA Charge # 95-0066

Dear Ms. Moore,

On March 22, 1995 Scott Peterson of the IAM represented you in the filing of the above mentioned grievance related to you not passing probation for a cruise desk position. You have also filed a similar complaint with the City of Tampa Civil Rights Commission. You made it quite clear after your disqualification that, in your opinion, you were not given a fair opportunity to learn the functions of the desk, making accusations of a racial and/or unprofessional environment under which training took place. At that time I forwarded the grievance to the second level because the contract calls for a board of Company and IAM members to determine the validity of the disqualification.

While I continue to disagree with your assessment of the circumstances on the whole, I would agree that the timing of the training was not ideal, in that we were in the peak season at the desk and everyone, including the trainer, was under stress to keep up with the work at the desk while trying to train two new people. However, let me point out that nearly every agent currently at the desk was trained successfully during the winter season. I found no evidence that there was any racial motivation on anyone's part, nor did I find that there was an attempt to cause you or anyone else to fail in the training.

Recently the new IAM General Chair, Cheryl Hoover, and Scott met with me to discuss the situation after they spent time hearing your opinions regarding the training. In a spirit of cooperation with Ms. Hoover, and to attempt to resolve the negative feelings you bear regarding the first training effort, the Company is prepared to offer the following as a resolution of your grievance and your charge:

1. The Company will agree to another training period of up to eight weeks and schedule it during the 'off-peak' cruise season, i.e. before October 1, 1995. No guarantee is made or implied that this period will be less demanding, but historically it has been a slower period.

DEFENDANT'S
EXHIBIT NO. 12
FOR IDENTIFICATION
1-12-01
DATE.      RPTR: /C

WPD Document 54     Entered on FLSD Docket 03/12/2001     Pag

2. A different trainer will be utilized. In my discussion with Cheryl Hoover she indicated that you
   would not feel comfortable having the same trainer. I have no problem with that, as my goal
   was and still is, to make the training as effective as possible to reach the original objective - add
   a qualified agent to the desk to satisfy the needs of our cruise clients.

3. The training syllabus will be laid out in advance and input secured from you, the IAM and
   myself to ensure that the material to be covered is a reasonable representation of what is
   required to be proficient to pass probation and successfully work all desk functions.

4. The issue of the number and degree of errors made in the first training attempt has been a
   source of contention . Errors you make will not be measured on the basis of whether a trained
   agent has ever made a similar error, but on the basis of the number, severity and frequency with
   which your errors occur. Your errors must be reasonable as judged by me in accordance with
   what was found to be acceptable for prior trainees and agreed to by their trainers and generally
   by what was demonstrated by the most recent trainee to successfully pass probation. Input will
   be gathered from your trainer and the IAM representative in the review process.

5. Training and testing will be arranged in one week modules. You will be tested at the end of
   each week to demonstrate proficiency in the material covered to date. All of your work will be
   collected and reviewed by both an IAM representative and myself along with the trainer and it
   will constitute part of your testing. If you have demonstrated sufficient working knowledge of
   the material you will continue to the next week of training and testing until the 8 weeks'
   training is complete. At that time, you are expected to have a functional degree of proficiency
   but you would not be expected to be an 'expert'. Conversely, failure to show a reasonable
   quality in your work (i.e. an acceptable number of errors and customer satisfaction) or if you
   lack an acceptable level of comprehension of the material at the end of any week's testing and
   review the training will end at that point, you will not pass the probationary period and the
   matter will not be subject to challenge in any forum except upon the written consent of both the
   IAM representative and the Company. If the IAM representative and the Company agree to
   review your challenge, you will bear the burden of demonstrating by a substantial weight of the
   evidence that the Company did not have just cause to disqualify you from the cruise desk
   position on the basis set forth in this agreement.

6. You agree to withdraw with prejudice Grievance #112311 and FEPA Charge No. 95-0066. You
   further agree that this settlement resolves any and all claims you have or may have had with
   respect to your training and disqualification for the cruise desk position. Finally, you agree that
   any dispute you may have with respect to the administration of this settlement shall be resolved
   exclusively by and only under the terms of paragraph 5, above, without other recourse in any
   other forum.

Your signature below represents your acceptance of the Company's offer as a resolution and the grievance and charge will be withdrawn.

Sincerely,
NORTHWEST AIRLINES

Tim Bechtold
Operations Manager

Grievant_____IAM_____

Company Representative_____Date_____

cc: Employee File
    Scott Peterson, Local IAM Rep.
    Local File
    Labor Relations - Gary Soma
    James Denzer, Law Dept.
    Lori Talafous
    Cheryl Hoover, District IAM

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To:<br>Ms. Madie Moore<br>3432 Hunter Run Lane<br>Tampa, FL 33614 | From:<br>Equal Employment Opportunity Commission<br>100 Alabama Street, N.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
|---|---|

[  ]  *On behalf of person(s) aggrieved whose identity is*
      *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 110980648 | Charles E. Mitchell, Supervisor | (404) 562-6823 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]   More than 180 days have passed since the filing of this charge.

[   ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[   ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[   ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[   ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosure(s)

*Bernice Williams-Kimbrough*
Director
Atlanta District Office

*October 16, 1998*
*(Date Mailed)*

cc:   Northwest Airlines

**DEFENDANT'S**
EXHIBIT NO. *13*
FOR IDENTIFICATION
*1-12-01*
DATE:           RPTR:

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6079–Civ–Dimitrouleas/Johnson

| | | |
|---|---|---|
| **BLANCHE BENFORD,** | ) | |
| **CLAVEDIA BROS, and** | ) | |
| **MADIE MOORE** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **ORIGINAL** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **NORTHWEST AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF TIMOTHY J. BECHTOLD

I, Timothy J. Bechtold, state as follows:

1.     I am over eighteen years of age and am competent to give this declaration. I have personal knowledge of the following and if called to testify as a witness will testify thereto.

2.     I worked for Northwest Airlines, Inc. ("Northwest") from September 1987 to June 1998. From November 1992 to May 1997 I worked as the Operations Manager in Northwest's reservation sales office located in Tampa, Florida ("Tampa reservations").

3.      Madie Moore ("Moore") was a reservation sales agent in Tampa reservations. As Operations Manager, I was one of the Moore's managers. I recall that in October 1994, Moore successfully bid on a cruise desk position in Tampa reservations.

4.      The cruise desk was worked by reservation sales agents who received the same compensation and benefits as other reservation sales agents working other Tampa reservation positions.

5.      The cruise desk was a position within Tampa reservation where reservation sales agents coordinated with cruise lines to provide flights to and from cruise ship ports.

6.      Prior to Moore being awarded a permanent position on the cruise desk she was required to undergo a probationary training period.

7.      Shawna Horvath[1] provided training to Moore during her probationary training period on the cruise desk. Horvath's training of Moore included the introduction of material and skills necessary for Moore to successfully complete the probationary period on the cruise desk. While Horvath was to provide training to Moore, Horvath was also to continue her responsibilities as a reservation sales agent on the cruise desk.

8.      Moore received three training reviews during her probationary period on the cruise desk. These reviews were conducted by me as Operations Manager for Tampa reservations, and occurred on or about November 23, 1994, January 20, 1995, and February 24, 1995.

_____

[1]Horvath was not a supervisor or manager, but rather a reservation sales agent like Moore.

2

9.      Each of Moore's three probationary review meetings was memorialized by myself in memoranda dated November 23, 1994 ("November Memo"), February 1, 1995 ("February Memo"), and March 3, 1995 ("March Memo"). (The November Memo, February Memo, and March Memo are attached hereto as Exhibits 1, 2, and 3, respectively, and are referred to collectively as "training memoranda").

10.     I reviewed specific performance problems and errors committed by Moore while training on the cruise desk. I also met with Shawna Horvath to discuss Moore's performance problems while training on the cruise desk.

11.     The training memoranda accurately set forth the performance of Moore while training on the cruise desk, including the significant problems and errors identified in her training subsequent to her first training review on November 24, 1994.

12.     Moore's training prior to November 23, 1994 was considered to be "ahead of expectations." (See Exhibit 1).

13.     While there were areas noted in Moore's training review of November 23, 1994 where improvement was needed, Moore's overall "work performance [was] very good" and I informed Moore that "we are committed to giving you the best possible instruction and materials available through the remainder of the training process." (See Exhibit 1).

14.     Moore was reminded in her November Memo to let me or her "trainer know if there is anything more we can do to ensure your continued success through the remainder of your probation period." (See Exhibit 1).

3

15.    At Moore's second probationary review on January 20, 1995, I informed Moore that despite her "first review [being] very favorable, indications are that your performance has since fallen off in some significant ways." (See Exhibit 2).

16.    As of January 20, 1995, Moore had been training on the cruise desk for 17 weeks, but only 50% of the total material required for successful completion of the training period had been introduced. (See Exhibit 2).

17.    Moore's probationary review period was initially scheduled to last approximately 90 days. However, because Moore's first two training reviews were incongruent, I decided to extend Moore's training period for an additional 30 days.

18.    Moore's February Memo provided a list of some of the problems and errors with Moore's performance since her first probationary training review on November 23, 1994. (See Exhibit 2 for detailed explanation of problems and errors).

19.    The "problems and errors" contained in the February Memo were not a complete list of the problems discovered in Moore's work since her first training review on November 24, 1994. (See Exhibit 2).

20.    Moore's second probationary training review on January 20, 1995 concluded with my offer to extend Moore's probationary review period an additional thirty days and to set up a "refresher" on the material covered so far in the training period. I also informed Moore that should she "have any questions or concerns, [that she should] feel free to speak to me." (See Exhibit 2).

4

21.    On February 24, 1995 I met with Moore to discuss her performance during the additional thirty-day training period between January 20, 1995 and February 24, 1995.

22.    During the February 24, 1995 meeting, I explained to Moore that her performance problems had persisted over the last thirty days since her second review on January 20, 1995, and that as a result she was disqualified from the cruise desk and reassigned to the national sales desk.

23.    Moore's March Memo provided additional performance problems occurring during January and February. (See Exhibit 3 for detailed explanation of problems and errors.)

24.    Moore's disqualification did not affect her employment with Northwest as a reservation sales agent. Moore's compensation and benefits remained the same regardless of whether Moore worked on the cruise desk or the national sales desk.

25.    On or about July 11, 1995, I met with Moore and Scott Peterson, an IAM representative to discuss Moore's grievance, following her disqualification from the cruise desk.

26.    I offered Moore an additional eight weeks of training on the cruise desk in an attempt to resolve Moore's grievance. I presented Moore with a letter dated July 11, 1995, which extended this offer. (July 11, 1995 correspondence attached hereto as Exhibit 4).

27.    Moore rejected the offer for an additional eight weeks of training on the cruise desk.

Under penalty of perjury, I declare the foregoing to be true and correct. Executed on

this the ___7th___ day of March, 2000.


TIMOTHY J. BECHTOLD

6

*Interoffice Communication*

NORTHWEST AIRLINES

To MADIE MOORE

From TIM BECHTOLD

Location TPA RESERVATIONS

Subject TRAINING REVIEW

Date NOVEMBER 23, 1994

This IOC is a follow-up to the meeting held in my office to review your performance to date in your trainee position at the Cruise desk.

After discussing your work performance with your trainer I met with you and the following points were outlined:

1) Your progress at this point in the training is actually ahead of expectations. Congratulations!

2) You demonstrate an excellent grasp of the material presented so far, and have shown yourself to be conscientious, self-motivated and committed to the training process.

3) You appear focused and are showing good results in comprehending each new phase as it is taught. In the early phases of training, you did show some difficulty in recalling previous material after having moved on to a new topic. You agreed to make better use of the reference sheets provided to help you in the recall process. In the normal course of working the desk, you will be required to move quickly from one topic to another many times each day. Your trainer indicated just prior to our meeting you have already begun to catch on to using the sheets.

4) We touched briefly on being more conscious of others working next to you and to the customers on their phones when you finish a difficult call. You agreed to be careful not to make comments out loud that could disturb others or be overheard by customers on the phones since the headsets can pick up surrounding voices more easily when you are sitting at the linear rows as opposed to the agent pods on the sales floor.

DEFENDANT'S EXHIBIT NO. 7 FOR IDENTIFICATION
DATE: 1-12-01 RPTR: K

EXHIBIT
Bechtold Decl. Ex. 1

5) Overall, your work performance is very good. You have shown sound judgement in prioritizing your work and have been thorough in completing the tasks assigned to you. I encourage you to continue to put in the kind of effort and concentration you've been showing so far. Learning all the facets of the desk can be very challenging, even frustrating. We are committed to giving you the best possible instruction and materials available through the remainder of the training process. Let me or your trainer know if there is anything more we can do to ensure your continued success through the remainder of your probation period.

*Interoffice Communication*

NORTHWEST AIRLINES

To MADIE MOORE

From TIM BECHTOLD
MGR, OPERATIONS

Location TPA RSO

Subject PROBATIONARY REVIEW II

Date FEBRUARY 1, 1995

On January 20, 1995 we met in my office for the second review of your work performance on the Cruise desk. Scott Peterson was present for the IAM.

While your first review was very favorable, indications are that your performance has since fallen off in some significant ways. I went over some of the problems and errors:

- You quoted a higher fare than necessary on an itinerary overcharging a customer and creating a customer confidence issue.

- On two other sailings you failed to quote the higher applicable fare costing NW $100 on each of those transactions, $200 total.

- You left incomplete work on your desk and went on vacation failing to pass the work on to someone else to complete. Eventually the cruise line sent another set of the sailing information and another agent apologized that we "lost the information" and booked the space. Afterwards we discovered the space you had booked and we had to go back spending more time to cancel the duplicate seats. Time was wasted and another customer confidence issue was created.

- A request for space out of GRF was incorrectly booked by you from GRR. The problems this creates are obvious if not caught by someone else before the travel date.

- You failed to advise the cruise line of space the passengers wanted us to book out of FLL. The cruise line ticketed to the 'default' city, MIA, and the airport had to reaccommodate the passengers as we were not actually holding confirmed space out of MIA for them.

- On the same sailing you omitted a booking for a passenger from BIL, leaving someone down the line to scramble to accommodate them.

EXHIBIT
Bechtold Decl.
Ex. 2

DEFENDANT'S
EXHIBIT NO. 8
FOR IDENTIFICATION
DATE: 1-12-01 RPTR: JC

- While the cruise line's fax (used to firm the space they are holding) did not include space from MSP, you confirmed 28 seats back to them from the original block without even questioning them on it. This is a basic concept of working the 60 day flight firm. Your job is to try to free up space the cruise lines don't confirm to us at this point. Failing to understand this concept ties up a huge amount of inventory and can create large revenue losses if the unused space is not released for resale. You have been working on this concept for over 12 weeks and should understand it thoroughly by now.

- You missed one name on a record and duplicated another. The confusion this created at the airport for the "missing" passenger created ill-will and delayed handling until the airport could clear it up.

- You booked a wrong return date for 2 passengers. When they showed up at the airport on the correct date, we had to overbook the class of service to accommodate them. The meant giving up full "Y" class seats that potentially could have been sold to walk-up traffic or other high yield business passengers. The difference in the air/sea fare they paid and the fare applicable for those seats meant a potential loss of $514.00 in revenue. You also booked them on an invalid routing and used the wrong fare basis and ticket designator, and you failed to record who you booked the record with, a standard requirement in all Cruise desk PNRs. Overall, the problems created on this transactions prompted the cruise line agent to ask "What's wrong with you guys?" Obviously, a customer confidence issue as well as time and revenue wasted.

This is not a complete list of the problems discovered in your work since the last review. But hopefully, it will help you to understand the critical nature of the work done at the desk and the urgent need for you to focus fully and carefully on each thing you do. Considering the customer issues and the economic impact of failing to meet the requirements of the desk, you will have to demonstrate a marked improvement in your performance within the next 30 days to be able to continue at the desk.

You demonstrated an excellent grasp if the material in the first review and your work habits were quite acceptable at that stage. The work is exacting and demanding, and it is not suited to everyone. As a sales agent, you demonstrated you have the talent and abilities to contribute to the success of Northwest Airlines. In light of that we are committed to giving you every opportunity to see if this new work is suited to your personality and those same abilities.

I agreed to set up a refresher of the material covered with you so far, which is only about half of the total required. But since you have been training or practicing for 17 weeks on only 50% of the total material required, we will not be able to extend the process further if you don't demonstrate proficiency in this area by the end of the 30 days mentioned above.

Despite the problems, I offer my appreciation for the efforts you have put forth to attempt to learn the procedures of the desk. I hope we can find a common solution to meeting our customers' high expectations and NWA's goals for profitability and success.

If you have any questions or concerns, feel free to speak to me.

*Interoffice Communication*

MAR 31 1995

**NORTHWEST AIRLINES**

To    MADIE MOORE

From   TIM BECHTOLD
       MANAGER, OPERATIONS

Location TPA RESERVATIONS

Subject PROBATION REVIEW III

Date   MARCH 3, 1995

This IOC will confirm the substance of your third probationary review
for a Cruise desk position which was held in my office on February 24,
1995.

I showed you a large number of your work errors and problems, which
are on-going from the previous review. I found you were not clear on
concepts you should be well versed in from over 20 weeks of training
or practice on the desk. The training process has historically been an
8 week program. At this point you have covered approximately half the
material necessary to pass probation because I instructed the trainer
not to move on until this material was mastered.

Some of the problems we discussed occurred over several weeks in
January and February and involved:

- entering incorrect names or failing to add names

- failing to advise of a required upgrade fare on several
  occasions causing NW to lose significant revenue

- putting incorrect information in PNR headers causing
  confusion and difficulty in tracking and accounting

- failing to understand and follow flight firming procedures
  tying up large amounts of inventory

- several records were created by you with wrong origin or
  destination codes creating potentially serious problems in mis-
  routing or at least a confidence issue with the cruise line' if
  discovered in time.

- You missed deviations which were on the fax. If this kind of
  mistake isn't caught by someone, these passengers end up being
  booked to or from the wrong airport, creating major customer
  service issues and usually requires rebooking on an OAL at a
  great expense to NW.

EXHIBIT
Bechtold Decl.
Ex.3

DEFENDANT'S
EXHIBIT NO. 9
FOR IDENTIFICATION
1-12-01
DATE:        RPTR:

   - Since the review I became aware of a complaint from a cruise
     line client who expressed concern with the number of errors
     they were finding in your work after 20 weeks of training.

Reviewing the 30 and 60-day firming work you did since our last
meeting revealed a disturbing number of errors. Considering the amount
of time you have had to learn this material and the number of sailings
you've worked on to gain proficiency, it is my judgement that this
type of work is not suited to you. Therefore, you are disqualified
from the Cruise desk and will be reassigned to National Sales
effective Monday February 27, 1995.

I expressed my appreciation for your interest in the Cruise desk and
for the efforts you did put forth to try your hand at a very unique
but exacting job function.

This decision in no way reflects on your overall performance in
reservations. It is merely an indication that your talents and
abilities are better demonstrated in your prior role as a National
Sales agent than as a Cruise Desk agent. I look forward to your
continued success in the sales area.

To: LeeAnn

C₀/ₒ J. Denver

Dept.

Fax #: (12 727-64vv

From: Tim Bechtel

Co.

Phone #: 813 887-2204

Fax #:

Exhibit F

July 11, 1995

Ms. Madie Moore
7342 Brookview Circle
Tampa, FL 33634

RE: IAM COFPS Grievance File # 112311
    FEPA Charge # 95-0066

Dear Ms. Moore,

On March 22, 1995 Scott Peterson of the IAM represented you in the filing of the above mentioned grievance related to you not passing probation for a cruise desk position. You have also filed a similar complaint with the City of Tampa Civil Rights Commission. You made it quite clear after your disqualification that, in your opinion, you were not given a fair opportunity to learn the functions of the desk, making accusations of a racial and/or unprofessional environment under which training took place. At that time I forwarded the grievance to the second level because the contract calls for a board of Company and IAM members to determine the validity of the disqualification.

While I continue to disagree with your assessment of the circumstances on the whole, I would agree that the timing of the training was not ideal, in that we were in the peak season at the desk and everyone, including the trainer, was under stress to keep up with the work at the desk while trying to train two new people. However, let me point out that nearly every agent currently at the desk was trained successfully during the winter season. I found no evidence that there was any racial motivation on anyone's part, nor did I find that there was an attempt to cause you or anyone else to fail in the training.

Recently the new IAM General Chair, Cheryl Hoover, and Scott met with me to discuss the situation after they spent time hearing your opinions regarding the training. In a spirit of cooperation with Ms. Hoover, and to attempt to resolve the negative feelings you bear regarding the first training effort, the Company is prepared to offer the following as a resolution of your grievance and your charge:

1. The Company will agree to another training period of up to eight weeks and schedule it during the 'off-peak' cruise season, i.e. before October 1, 1995. No guarantee is made or implied that this period will be less demanding, but historically it has been a slower period.





2. A different trainer will be utilized. In my discussion with Cheryl Hoover she indicated that you would not feel comfortable having the same trainer. I have no problem with that, as my goal was and still is, to make the training as effective as possible to reach the original objective - add a qualified agent to the desk to satisfy the needs of our cruise clients.

3. The training syllabus will be laid out in advance and input secured from you, the IAM and myself to ensure that the material to be covered is a reasonable representation of what is required to be proficient to pass probation and successfully work all desk functions.

4. The issue of the number and degree of errors made in the first training attempt has been a source of contention . Errors you make will not be measured on the basis of whether a trained agent has ever made a similar error, but on the basis of the number, severity and frequency with which your errors occur. Your errors must be reasonable as judged by me in accordance with what was found to be acceptable for prior trainees and agreed to by their trainers and generally by what was demonstrated by the most recent trainee to successfully pass probation. Input will be gathered from your trainer and the IAM representative in the review process.

5. Training and testing will be arranged in one week modules. You will be tested at the end of each week to demonstrate proficiency in the material covered to date. All of your work will be collected and reviewed by both an IAM representative and myself along with the trainer and it will constitute part of your testing. If you have demonstrated sufficient working knowledge of the material you will continue to the next week of training and testing until the 8 weeks' training is complete. At that time, you are expected to have a functional degree of proficiency but you would not be expected to be an 'expert'. Conversely, failure to show a reasonable quality in your work (i.e. an acceptable number of errors and customer satisfaction) or if you lack an acceptable level of comprehension of the material at the end of any week's testing and review the training will end at that point, you will not pass the probationary period and the matter will not be subject to challenge in any forum except upon the written consent of both the IAM representative and the Company. If the IAM representative and the Company agree to review your challenge, you will bear the burden of demonstrating by a substantial weight of the evidence that the Company did not have just cause to disqualify you from the cruise desk position on the basis set forth in this agreement.

6. You agree to withdraw with prejudice Grievance #112311 and FEPA Charge No. 95-0066. You further agree that this settlement resolves any and all claims you have or may have had with respect to your training and disqualification for the cruise desk position. Finally, you agree that any dispute you may have with respect to the administration of this settlement shall be resolved exclusively by and only under the terms of paragraph 5, above, without other recourse in any other forum.

Your signature below represents your acceptance of the Company's offer as a resolution and the grievance and charge will be withdrawn.

Sincerely,
NORTHWEST AIRLINES


Tim Bechtold
Operations Manager




Grievant_____IAM_____


Company Representative_____Date_____

cc: Employee File
    Scott Peterson, Local IAM Rep.
    Local File
    Labor Relations - Gary Soma
    James Denzer, Law Dept.
    Lori Talafous
    Cheryl Hoover, District IAM